## No. 9450.

### SUCCESSION OF MYRA CLARK GAINES.

In a contest over an olographic will, the probate of which has been resisted as soon as the instrument was presented, on the ground that said will is not in the hand-writing of the deceased, and is therefore a forgery, the burden of proof of the validity of the will is on the party who presents the same for probate.

The proof of the writing and signature of the testator by at least two credible witnesses, which is considered sufficient under the laws of Louisiana, applies only to wills which are not opposed or contested.

In contestations which involve the validity of wills, as regards the genuineness of the same all legal modes of proof, including the testimony of experts, and comparisons of writings are admissible, and all such evidence must be considered by the courts.

In such cases the alleged physical incapacity of the testator, at the date of the instrument, to write a will or to date the same, is a legal element of proof to be considered. So is the mode of acquiring possession of the will by the party who presents it for probate, an element to be considered; and in case that a mysterious or unnatural manner is indicated by the party, the burden of proof is on him to show the actual delivery of the will to him as alleged.

The court will also consider the character of the dispositions contained in a contested will, as a means of testing the validity of the will, by the probabilities of such donations.

When the evidence in a cause is sufficient to justify a final judgment in the case, courts of justice would be derelict to their duty in refusing to give it legal effect and to thus end the litigation.

Evidence and considerations which, in a contest over a will in the olographic form, would justify that the will is not genuine, must carry with them the conclusion that the will was not written by the deceased and is therefore a forgery.

An amendment on appeal, which does not alter the practical result flowing from the judgment of the court *a qua*, but merely strikes out some irrelevant matters, will not visit costs of appeal on the appellee.

APPEAL from the Civil District Court for the Parish of Orleans. *Houston, J.*

---

*Breaux & Hall* and *A. H. Leonard* for Mrs. Evans, Appellant :

The following legal propositions are elementary :

1. La date ne doit pas être mise le jour même où le testateur écrit ses dispositions. Laurent, XIII, p. 1700, No. 204.

·2. "On admet que le testament olographe fait foi de sa date." Laurent, XIII, 269, 274, Nos. 242, 243 ; Demolombe, Don. IV, p. 158 ; Gilbert (Codes), 429.

   Un testament olographe est regardé comme *un acte solennel* qui fait foi de sa date. Toullier, III, p. 210 ; Cassation, Juin, 1810 ; Sirey, p. 290.

   So that if the writing be proven, the date will be assumed to be made as indicated. This is not a presumption *juris et de jure*, but it is sufficiently strong to control in cases of conflicting testimony.

3. L'obligation de dater le testament n'emporte pas l'obligation d'indiquer le *lieu* où a été fait." Gilbert, p. 428.

·4. "The presumption of innocence is too strong to be overcome by an artificial intendment of law." Starkie on Evidence.

5. The proof by witnesses who have not seen a person write or sign, and who only express their belief or knowledge of the genuineness of the signature in dispute, from its similarity and likeness to signatures of the same person which they have seen, has always, in itself, something rather vague and unsatisfactory, if not corroborated by circumstantial evidence." 15 La. p. 264.

·6. "We would have been better satisfied with some evidence explanatory of the conduct of plaintiff, so little in accordance with the usual springs of human action, at least with that most powerful of all, self-interest! We concede the suspicions which may attach to the appearance of this small scrap of paper as the title to a large fortune. But, after all, suspicions are not permitted to counterbalance, in the judicial mind, the testimony of numerous and uncontradicted witnesses. It is in the recollection of some of us, that a dirty fraction of a half sheet of foolscap, was the vehicle for the devise of the large fortune of the late Chief Justice Martin." Penn vs. Cities, 13 Ann. 87.

*T. J. Semmes & Payne* and *A. Goldthwaite*, for Hilder and others, *contra :*

1. When the genuineness of a last will and testament in the olographic form is denied, evidence as to handwriting and comparison of same may be introduced and made, together with all the circumstances attending the alleged making of the will. C. C. Art. 2245 ; C. P. Art. 325 ; 9 La. 560–2 ; 18 Ann. 445 ; 2 Ann. 667.

2. The finding of a will and the history of its possession are material facts to be considered, and should be satisfactory and occasion no distrust in the mind of the court. 13 Ann. 86 ; 18 Ann. 445 ; Williams on Executors, vol. 1, p. 292, 4th Am. Ed. ; 2 Haggard Eng Ecclesiastical Rep. 531 ; 1 Addams Eng. Ecclesiastical Rep. 162 ; 2 Addams, 53 ; 1 Haggard, 60.

3. A person who accounts for the finding by saying a neighbor, or third person, gave it to her, may be believed ; but when the neighbor, or third person, is produced and denies the statement, the presumption is that the statement of the finding is untrue.

4. A person offering a will for probate, which is denied to be genuine, and alleged to be

forged, has the burden of proof upon her; she must make her case not merely probable but legally certain. 18 Ann. 449.

5. Any evidence that will aid the trial judge, sitting as a jury, in comparing and examining different specimens of hand-writing, such as photographic copies, a stereopticon to enlarge and magnify true copies, is admissible. Lawson on Expert and Opinion Evidence, 414-15; 16 Gray, (Mass.) 160; 2 Baxter, (Tenn.), 231. .

6. An appellate court may make the comparison for itself. Lawson on Expert and Opinion Evidence; 6 Court of Claims, 421.

The opinion of the Court was delivered by

POCHÉ, J. On the 12th of January, 1885, Mrs. Marie P. Evans presented for probate, as the olographic will of the deceased, the following instrument:

"New Orleans, January 8, 1885.—I, Myra Clark Gaines, being of sound mind, bequeath to my excellent friend, Mrs. Julietta Perkins, as a token of my esteem and love, that part of my estate known as the Fuentes property, and to my friend, Mrs. Marie P. Evans, one-third of the remainder of my entire estate, the balance to be divided equally between my grandchildren. I appoint Mrs. Marie P. Evans, my testamentary executrix and detainer of my entire estate, without, bond."

(Signed)                                  "MYRA CLARK GAINES."

In connection therewith, she exhibited another document, in the shape of a letter, and which reads as follows:

"Confidential.—Washington, D. C. August 23, 1884.

"My dear Mrs. Evans—I have been very unwell but am quite well again. I am pleased to learn the news of the bank suit, but feel most anxious about your success. With love, I bequeath to your excellent mother that portion of my estate known as the Fuentes property; and to you, dear Mary, one-third of the remainder of my whole estate. As you are the friend I trust above all others, I appoint you my testamentary executrix and detainer of my entire estate, without bond. With love to your excellent mother and the kindest regards to to your husband,

I am ever your friend,

MYRA CLARK GAINES..

"Excuse this scrawl, my hand trembles and I am very weak.

"Adieu again,                                  MYRA."

To these two documents, she supplemented another instrument, indicating similar testamentary dispositions, and which is in the following words:

"Washington, D. C., November 10, 1881.

"I, Myra Clark Gaines, bequeath, in this, one-third of my estate to Mrs. Marie P. Evans, and my Fuentes estate to her mother, Mrs. Perkins, in token of my love for them.

"I, Myra Clark Gaines, sign the above most heartily.

(Signed)                               "MYRA CLARK GAINES.

"New Orleans, December 18, 1884."

On the same day, the court was asked to probate a will in nuncupative form under private signature, purporting to have been executed by the deceased Myra Clark Gaines on the 5th of January, 1885. This will was presented by W. H. Wilder and I. Y. Christmas, who had been therein appointed as executors, and who, on the same day, resisted and opposed the probate of the will presented by Mrs. Evans on the ground that it was not a genuine will written by Mrs. Gaines.

Probate of the nuncupative will of the 5th of January, was resisted by Mrs. Evans on the ground that it had been superceded by the will of January 8, and of non-observance of legal formalities.

Further opposition was made to the alleged will of January 8, by I. Y. Christmas in his capacity of natural tutor of his children, who are the grandchildren and heirs at law of the deceased.

By agreement of counsel, the issues presented under these several pleadings, were tried and determined together. The result was a judgment which rejected the nuncupation will of January 5, as defective in form ; and decreed that the instrument purporting to be the olographic will of Mrs. Gaines, was fraudulent and forged, and not entitled to probate as a will.

No appeal was taken from the judgment in so far as it annuls the nuncupative will, hence that question is eliminated from the present discussion.

This appeal is prosecuted by Mrs. Evans, and it presents the question of the validity of the alleged will of January 8, 1885.

The undisputed facts of the case are as follows:

Mrs. Myra Clark Gaines died in the city of New Orleans, on Saturday the 9th of January, 1885, at two minutes past eleven o'clock at night, at the age of 78 years, after a lingering illness, (capillary bronchites), of twelve days, at the house of L. L. Davis, No. 150 Thalia street.

Her disease progressed steadily, without any reaction, her condition growing worse day after day, until death ensued.

During her illness, she was attended to and nursed by Mrs. Virginia Davis, the wife of L. L. Davis, by the latter's niece named Adolphine

Case, by Mrs. I. M. Walsh, a near neighbor and a relative of Mrs. Davis, and by a Mrs. Letitia Bringier Gonzales, a life-long friend of Mrs. Gaines, who became afterwards Mrs. Bradley. Her physician was Doctor W. H. Holcomb, from whose testimony it appears that on the 5th of January, 1885, Mrs. Gaines was unable, through weakness and exhaustion, to sign her name to the will made on that day, and that in order to affix her cross thereto she required his assistance to hold and guide her hand.

It also appears that, between that day and the day of her death, Mrs. Gaines signed several documents in the presence of witnesses, and that in each case she made her cross with the assistance of some one of the persons present, after declaring that she was too weak to sign her name.

All other facts connected with the case are disputed and very warmly contested. Hence the truth had to be searched through a mass of conflicting testimony, composing an enormous record, and by means of comparison of the hand-writing in the three documents which are hereinabove transcribed, with the hand writing admitted to be that of Mrs. Gaines, in some eighty documents, mainly letters which, by consent of counsel, have been brought up in their original form.

In the performance of our painful task, we have divided the subject into four different branches of inquiry :

1. The alleged inability of Mrs. Gaines, on January 8, 1885, to execute in whole or in part, the will of that date, on account of her great weakness and exhaustion, through sickness, and of other surrounding circumstances.

2. The manner by which Mrs. Evans claimed to have obtained possession of said will.

3. The alleged improbability of the dispositions contained in said will.

4. The genuineness or forgery of the hand-writing of the body and of the signature of said will, and of the two documents presented therewith.

We must, however, first lay down the rules by which our courts should be guided in the investigation of such cases.

We note in this connection that appellant's counsel urge the rule that after proof of the signature of the testator by at least two credible witnesses, under the requirements of Article 1655 of the Civil Code, the burden of proof is on the party who opposes the execution of the olographic will.

We understand that rule to apply to the probate of a will which is not opposed, as a part of the mortuary proceedings looking to the settlement of the succession of the deceased. When the olographic will is presented and due proof is administered of the genuineness of the testator's hand-writing and signature, the will is ordered to be probated and executed. If thereafter any party seeks to annul or set aside the will on any legal grounds, he is met by these preliminary proceedings which have established the *prima facie* validity of the will, and under the effect of which he is charged with the burden of proof in support of his attack. But a different rule applies when the probate of the will is opposed *ab initio*, on the ground that it is a fraud and a forgery.

In such a case the denial of the genuineness of the will removes the contest from the domain of Article 1655 of the Code, and it presents an issue which must be determined under the rules which govern all contests involving the genuineness of a signature which is denied, and in such a case the burden of proof is on the party who relies on the genuineness of the proffered signature. C. C. 2245; Code of Practice, art 325.

Under such an issue the doors of justice are opened for the introduction of legal evidence, under all the forms which prevail in all contested facts or cases; and the textual provisions of the law recognize the mode of testing signatures by a comparison of the writing. 9 La. 559, Plicque and LeBeau vs. Labranche; 2 Ann. 724, Sophie vs. Duplessis et als.; Aubert vs. Aubert, 6 Ann. 104; Pence vs. New Orleans, 13 Ann. 86; Fox's Case, 18 Ann. 448.

Satisfied with the wisdom and with the absolute correctness of these rules, which were pointedly and practically enforced in Fox's case, 18 Ann. 448, we have felt authorized to consider all the legal evidence which the record affords, and which could throw any light on our path, including the testimony of seven respectable and credible witnesses, who testify to their belief in the genuineness of the writing and of the signature in the contested will, including also a minute comparison, with the aid of a powerful magnifying glass, of the hand-writing of the proffered will, with that in the original documents which have been brought up as containing the genuine writing and signature of Mrs. Gaines.

I.

The subject of our first inquiry involves the physical and mental condition of Mrs. Gaines on the 8th of January, 1885; and other cir-

cumstances connected with the possibility of her having made a will on that day.

The weight of the evidence has served to convince our minds of the following facts on this point :

The last time that Mrs. Gaines affixed her signature to any instrument or wrote any word or words in her own hand was on Sunday the fourth of January preceding her death.

On that day, with the assistance of three persons, two of whom lifted her up in her bed, and one of whom held a small board on which was laid the paper, she signed a nuncupative will under private signature, which she supplemented on the next day by the will which was annulled in this case as defective in form.

From that day on to the day of her death, she sank continuously and gradually without any perceptible improvement or reaction, and she never more attempted to sign her name. Whenever she desired to sign any instrument after that day, it was done by means of a cross, which she made with the greatest difficulty, and with the indispensable assistance of some person to hold and to guide her hand.

In the morning of the 8th, the very day on which she is represented to have made her olographic will, or at least to have written the words "Jan. 8th, 1885," her physician gave up all hopes of her recovery, and for that reason alone he allowed her nurses and attendants to humor her in one of her sick and dying fancies—to be given a steam or vapor bath.

From that operation she was replaced in her bed, materially weakened and alarmingly exhausted; her feet and hands began to swell, her ears grew black, and her condition gave unmistakable signs of a rapidly approaching dissolution, which occurred the next night at 11 o'clock.

Up to that time she had been able to hold a glass in her hands and to drink therefrom; from that time she lost even that faculty, and the only refreshments which she could take were in the liquid form, and these had to be administered by her nurses with the use of a spoon.

These facts are gathered in the main from the testimony of Mrs. Davis, her niece Miss Case, and her relative and neighbor, Mrs. I. M. Walsh, to whose testimony we attach great weight and importance mainly because it emanates from persons entirely disinterested, also because their respective statements are mutually corroborative, because their answers are given without hesitation, without unnecessary explanations and without deviation, and because their whole testimony leaves the unmistakable impression of candor and truth, a character-

istic unfortunately not found in the testimony of several other witnesses in the case.

These three witnesses agree in the statement that from, and including Sunday the fourth of January, to the time of her death, Mrs. Gaines was never left alone a single moment; that one, at least, of these three ladies was constantly present and awake night and day in her room, and that neither of them ever saw her handle a pen or write a word in her own hand after that day. It would be next to impossible to estab a negative proposition with more certainty than is done in this instance.

A rather hazardous attempt is made to break down the testimony of these witnesses by that of one Florentine Pierce who swears that on one occasion she went up to Mrs. Gaines' room during that interval of time and found her absolutely alone. But we do not believe her. Her whole testimony is devious, tortuous, very unsatisfactory, and not in the least clad in the livery of truth. We deem it unnecessary to analyze her testimony in greater details.

We are thoroughly convinced that on the 8th of January, Mrs. Gaines was physically unable to write a single word, and that she did not write the will in question or any portion thereof on that day.

## II.

Our next inquiry is directed to the alleged manner in which Mrs. Evans obtained possession of the proffered instrument. Her theory is in substance as follows:

Having been informed through newspapers that her intimate friend, Mrs. Gaines, was lying very ill at No. 150 Thalia street, she left her own sick bed, to which she had been confined since the 24th of December, 1884, in the morning of Saturday, the 9th of January, 1885, and came down for the purpose of paying her a visit. She called at the house, but was refused admission to Mrs. Gaines' room by the latter's son-in-law, Mr. Christmas. She then came down to her lawyer's office, where she spent the better part of the day, in great distress of mind over the occurrence of her defeated visit to her bosom friend. From there she took a car on her return home at about four o'clock, p. m , but on reaching the corner of Thalia street, she left the car, with the intention of making another attempt to see Mrs. Gaines. In a disturbed state of mind, creating indecision of purpose, she passed by the house three times, when she was spoken to by a woman "dressed in shabby black, with a black veil tied on her head," who stood in the doorway and who asked her if she was Mrs. Evans.

On an affirmative answer the person "in shabby black," who looked very much confused and manifested great nervous excitement, handed her a handkerchief containing a paper folded therein, remarking to Mrs. Evans that it was sent to her by Mrs. Gaines. She did not know the woman in "shabby black," and she was not known to her. She then walked away without asking any questions, and on opening the bundle she found the paper in question, of which she then read but one line, refolded it, and taking a car, returned home without reading said paper before she reached her house.

Dealing with such a statement counsel for appellant can hardly expect but one answer from a court of justice. The explanation makes confusion worse confounded.

But on attempting to further explain, Mrs. Evans states that she subsequently ascertained the name and identity of the woman who had handed her the mysterious bundle, and that it was Mrs. Letitia Bringier, now the wife of J. S. Bradley; and that in a subsequent conversation, the woman had admitted that much to her.

Called in as a witness by the opponents, Mrs. Bradley flatly denied the whole statement, and emphatically declared that she knew nothing of the pretended will or of the mysterious bundle.

Appreciating the very damaging effect of that testimony, appellant's counsel devote a large portion of their brief to show that Mrs. Bradley is not a credible witness, and that she made numerous contradictory and glaringly untrue statements in the course of her testimony.

But conceding the full force of that line of attack, can we be expected to construe her denial into an affirmative statement?

Eliminate her testimony altogether, and the case is left with the uncorroborated narrative of Mrs. Evans.

Her unsupported evidence would tax the court to believe a romantic story, which finds no reason in any of the springs of human action, and to which no court of justice can conscientiously give credence.

In Fox's case the party charged with having delivered McDonogh's will to Fox was produced as a witness, and his testimony went to the support of the latter's theory. But weighing his testimony in the scales of surrounding circumstances, with the improbabilities of the case, the court refused to believe him.

In this case we are called to uphold a mysterious delivery of a will unsupported by the testimony of a single disinterested witness, and to that end to actually discard plausible testimony for the purpose of giving effect to an improbable theory. No court would undertake to go to that length.

We find no evidence in the record to justify the conclusion that Mrs. Gaines, who died in the belief that her estate would amount to two millions of dollars, and who left two sets of grandchildren for whom she had always shown the warmest attachment and manifested the utmost solicitude, would deliberately disinherit them of more than one-third of her estate for the benefit of any living being. This brings us to the consideration of our third inquiry, which involves the alleged improbabilities of the dispositions made in the pretended will.

### III.

In addition to what we have already said on this point, the record shows that Mrs. Gaines and Mrs. Evans were not related either by blood or affinity, and that their acquaintance dated only from the year 1870. It further appears that after an intimacy of several years with Mrs. Evans, the deceased had gradually become estranged from her and had lost all confidence in her.

The evidence is, perhaps, more conflicting on this than on any other point in the case. Hence we have analyzed it with more than ordinary care and attention, and the result of our examination is the conclusion that Mrs. Gaines had gradually withdrawn her friendship from Mrs. Evans. It is useless, and it would be a tedious labor, to go into details on that point. But the following facts cast a very significant light on the subject of this inquiry:

From the testimony of Mrs. Evans it appears that to her knowledge Mrs. Gaines had been in New Orleans at Mrs. Davis' house since the 8th of October, 1884, and that she also had been in the city during all that time, and they had not yet exchanged visits, or even the courtesy of the slightest correspondence.

The attempted explanation of that fact by Mrs. Evans is not satisfactory. Again, it does not appear that during her whole illness, Mrs. Gaines had requested any message for Mrs. Evans, or made any inquiry about her, while it is shown that she had been thus concerned about other persons. During the last days of her illness, Mrs. Gaines made several donations *inter vivos* and made two nuncupative wills, and in no instance did she make the slightest allusion to Mrs. Evans.

In this connection, counsel for appellant contend that the wills of the 4th and of the 5th of January, were not the result of Mrs. Gaines' voluntary desires, and that far from manifesting any wish to make a will, she had always expressed a decided aversion thereto.

It is shown, however, that she made several special legacies in both of these projected wills, and from the testimony of both sets of attesting witnesses it appears that she signed both wills without undue

persuasion, and without the slightest coercion. But in their zeal in that line of argument, intended to show that Mrs. Gaines had a great aversion to making a will, and that she did not, at any time, believe that she was about to die, counsel lost sight of the effect of such contention on the very will which they are endeavoring to probate.

And thus it appears that appellant gathers no strength from the consideration of the alleged probabilities of the testamentary dispositions as supporting the validity of the will.

### IV.

We now reach our fourth and last point of inquiry, and that involves the test of the hand-writing and the signature of the alleged olographic will and incidentally of the two other documents connected therewith.

Our researches on this branch of the case include the testimony of experts and of persons familiar with the hand-writing and signature of Mrs. Gaines, and a comparison made by ourselves of the hand-writing of the three instruments now under discussion with the admitted writing and signature of Mrs. Gaines in original documents which have come up with the record.

In this connection, it is contended by counsel for Mrs. Evans, that comparisons of hand-writings with each other and expert testimony on the same subject find little favor under the laws of Louisiana, and are very often precarious and dangerous; that experts may give opinions, but they must state the facts on which they are based, and that in verifying a signature the expert cannot refer to extraneous facts established in the case.

Counsel are mistaken in the proposition that such modes of verifying signatures have but litle force in Louisiana. Both modes are recommended by the very text of our law. C. C. art. 2245; C. P. 325. It is undeniably true that such testimony must yield when pitted against positive testimony. 15 La. 263, Robinson vs. Arnet. We find no fault with the other legal proposition advanced by counsel, and we have been guided by them in our consideration of the testimony on this branch of the case.

Hence we have given no weight to opinions expressed by some of the experts as to the impossibility of Mrs. Gaines writing as plain as was done in the will of January 8, on account of her physical weakness.

But we have given due weight to the facts recited by them as the basis of their opinion that the writing and signature of the will and of the confidential letter were not the genuine writing of Mrs. Gaines.

These experts were subjected to a very rigid cross-examination, under which it was ascertained that they had been mistaken in some of their elements or modes of comparison ; but it is nevertheless true that in the leading facts their testimony is correct as shown by the very thorough examination which we ourselves have made.

Besides the testimony of four experts, three of whom had been selected and appointed by the district judge, we find in the record the testimony of Mr. Christmas, of Mr. Wilder and of Mrs. Whitney, who have been familiar with the hand-writing of Mrs. Gaines for up-wards of twenty years, and who fail to recognize her genuine writing in either of the instruments in question.

We were very much impressed with the testimony of Mrs. Whitney, the daughter-in-law of Mrs. Gaines, who, in the course of a rigorous cross-examination, was put to the test of verifying the signature of Mrs. Gaines, without the opportunity of seeing the writing to which the signature was attached, made but very few mistakes in testing more than sixty signatures.

As stated by the experts, the hand-writing in these two documents has a general resemblance, and bears a striking similarity to that of Mrs. Gaines. But, notwithstanding this remarkable imitation, the forgery can be safely detected by considering certain striking features and peculiarities in the genuine writing of Mrs. Gaines, which were not successfully imitated in the two documents.

All the experts agree that the two documents, the will of January 8 and the confidential letter, as well as the words "I, Myra Clark Gaines, sign the above most heartily, New Orleans, December 18th, 1884," and the signature thereto in the third document, were written by the same person.

Now, the most striking feature in the writing of Mrs. Gaines was the uniformity of her signature, in the imitation of which the forger sig-nally failed in the three instruments.

A careful study of the documents containing the admitted signature of Mrs. Gaines, shows that she has two styles of forming the capital letter " G ; " one of which is to be found in all documents signed pre-vious to the year 1880, or thereabout, and another form prevailing from that time on, even to her signature on the fourth of January, 1885, which we think is her last genuine signature; and that neither of these forms is found in the three documents now under inspection, and it also appears that Mrs. Gaines has never made the capital letter " G " in the manner adopted in either of the documents in question.

In the will, as well as in the confidential letter, the letter " a " in Myra, ends with a loop or flourish, a feature which is never found in the genuine signature, unless it be when Mrs. Gaines signs " Myra " alone in a post-script. In the genuine signatures of the deceased, the letter " k " in " *Clark* " invariably ends with a loop, resembling the letter " e " as though she intended to write " *Clarke*," it even appears that she thus turns the letter " k " whenever it ends any word such as " *clerk* " " *ask*," etc., and in the two signatures under examination, the absence of the loop in finishing the letter " k " in *Clark* is signally apparent.

In her letters, Mrs. Gaines had two peculiarities in writing the word " friend," one in the letter " *f* " and the other in the letter " *d* " the attempt in the spurious will to imitate her form of " *f* " is quite palpable, but is an awkward failure, and the same may be said of the letter " *d* " in the same word, which terminates with a graceful loop, when Mrs. Gaines almost always terminated in the letter " *d* " with a downward stroke, and never with a loop.

In not a single word in all of the documents before us which were written by Mrs. Gaines have we found a capital letter " *J* " even resembling in form or character, the well defined, well shaped and elegantly finished " J " in the words " *Jan. 8th*," etc., in the *heading* of the will of that date; the same may be remarked of the word "*August*" in the heading of the confidential letter.

In every letter which we have seen from the pen of Mrs. Gaines, the date thereof and the name of the place whence written, are placed on the extreme right edge of the paper, so close thereto, as to leave barely enough space to write the necessary words. In the confidential letter, the words " *Washington, D. C.*" are placed near the middle of the line, more to the left of the paper; and in the spurious will, the words " *New Orleans* " are located on the extreme left edge of the paper.

We might go on in this way and establish a difference between the characteristic features and peculiarities of every word in the forged will and the peculiarities in shaping the same words in the genuine hand-writing of Mrs. Gaines. But this would be work of supererogation, and would serve no useful purpose. It is sufficient to say that we have made that identical comparison with the result as above indicated.

Our solemn conviction is that the will propounded by Mrs. Evans, is not in the hand-writing of Mrs. Gaines, and that it is manifestly a forgery, and that therefore the judgment of the lower court is correct.

It will be noticed from the tenor of this opinion, that the conclusion reached by us on the first point of our inquiry would, perhaps, have been of itself decisive of the whole controversy.

Under ordinary circumstances we might have been disposed to close the discussion at that point, but considering that the whole case was discussed by counsel in subdivisions which differed from those which we have adopted, and that all the points of investigation were very closely blended together, we have concluded to review the entire field of discussion, while we restricted our reasons to elucidate only the salient facts or features of the case.

Our study of the evidence has been exceedingly laborious and our comparison of hand-writings quite prolonged and very thorough ; hence we leave the case with the absolute conviction that our painful task has been faithfully and conscientiously performed.

The judgment appealed from is therefore affirmed.

### CONCURRING OPINION.

· FENNER, J. I do not profess to be an expert in hand-writing, and the document propounded as the will of Mrs. Gaines is too skillful an imitation of her writing to enable me to pronounce from mere inspection and comparison that it is a forgery. Nor would the testimony of the experts serve, unaided, to convince me of the fact. I discern differences between specimens of Mrs. Gaines' writing and signatures admitted to be genuine, quite as marked as those signalized in the evidence of the experts and in the opinion of the court.

Still, the contradictory evidence on the subject of the apparent genuineness of the will is of a nature to leave the question in serious doubt on this point, and to justify and require a resort to other circumstances for the purpose of determining it.

For, after all, the *factum probandum* is that this instrument is the veritable will of Myra Clark Gaines, and however perfect the resemblance to her writing, yet if the other proof in the case is of a character to satisfy the judicial mind that she did not execute it, the probate of the will must be denied.

Now in this case, I discover the following circumstances, several of which are adverted to in the majority opinion, but which I prefer to recapitulate and group together, in order that their collective weight, as operating on my mind, may be appreciated.

1st. There exists no bond of blood or affinity between the beneficiaries under the will propounded and Mrs. Gaines, while she left direct descendants, who were the natural objects of her affection and who

had done nothing to forfeit her bounty. It is difficult to conceive why she should divert from her grandchildren to these persons so large a share of her estate.

2d. The evidence leaves no doubt on my mind that the friendship which Mrs. Gaines had at one time felt for Mrs. Evans had suffered a great change during the latter years of her life. This appears from her letters and conversation, as well as from the greatly diminished intercourse between them. The change may have been wrought by the influence of others, but this does not negative its existence. Nor is it contradicted by the expressions of formal regard contained in contemporaneous letters to Mrs. Evans, written generally on business; and the nature of that business is itself a strong negation of the existence in the mind of Mrs. Gaines of any such benevolent sentiments towards Mrs. Evans as are evinced in the will. It related to hard and usurious bargains which Mrs. Gaines was then driving with Mrs. Evans under the convenient guise of a fictitious third person, repeating the trick of the usurer in Sheridan's immortal comedy, pretending to get the money loaned from another lender who was "an unconscionable dog." Her whole conduct in the premises displayed an eager desire to get the better of Mrs. Evans—certainly not natural towards one whom she contemplated as her intended legatee of so large a share of her estate.

In this connection I attach no weight to the curious documents produced and foreshadowing this will, because these and the will must stand or fall together as parts of one whole, all of which or none are genuine.

3d. The wills of January 4 and 5, four days preceding the date of the will propounded, though invalid for defects of form, were undoubtedly the free and genuine expression of the testamentary wishes of Mrs. Gaines, and are absolutely inconsistent with the existence in her mind at that time of any wish to make a disposition in favor of Mrs. Evans or her mother. Nothing occurred to the knowledge of any one having access to her, before or after the making of that will, indicating dissatisfaction with their dispositions, at least so far as her grandchildren were concerned, or any desire or intention to change it then.

4th. It is certainly a significant circumstance that Mrs. Gaines had made a conveyance of the Fuentes property, which was bequeathed to Mrs. Perkins in the pretended will, to Wilder, which was extant and unrevoked; and though it may have been a simulated title, Mrs. Perkins might have been unable to establish the simulation, and it is

strange that in making such a bequest she should not have alluded to the condition of the title, or left some clue for the legatee.

5th.    The mode in which the will came into the possession of Mrs. Evans, according to her own account, is mysterious and extraordinary. As she had had no access to Mrs. Gaines, the will must necessarily have reached her through some third person; and the person named by her absolutely denies any connection with it and contradicts the whole statement of Mrs. Evans.

I have duly considered the commentaries upon the character of this person's testimony and upon various significant circumstances which cast suspicion upon it.    While they raise a doubt as to its entire truthfulness and a suspicion that she had had some connection with the paper and some kind of dealing with Mrs. Evans in relation to it, they do not convince me that she spoke falsely in denying that she ever received the paper from Mrs. Gaines.

At all events, the statement of Mrs. Evans as to the manner in which the paper came into her hands is entirely unsupported and is denied by the only witness who could have confirmed it.

6th.    To cap the climax, the evidence places it beyond belief that Mrs. Gaines could have executed the will propounded on January 8. That evidence is stated with great force in the majority opinion and need not be repeated.

Conceding it to be possible that Mrs. Gaines, by a tremendous exertion of will power, might have written the words "January 8th, 1885" on that day, in the firm and shapely characters presented in this paper, yet it is manifest that, in order to do so, she must have either had assistance, or, at least, that the paper, the pen and the ink should have been at her hand.    The evidence leaves it doubtful whether she was ever, for a moment, alone on that day.    It is conclusive that no one assisted her to write any part of the document, and that she did not so write in the presence of any of her attendants; and that the pen, ink and paper were not together at her hand in such manner that she could have used them unassisted.    Unless some dark perjury lurks in the testimony of her attendants, it is humanly impossible that Mrs. Gaines executed that will or any part of it on the 8th of January, 1885.

Taking all the foregoing circumstances together, my mind is unable to resist the conviction that the document propounded is not the will of Myra Clark Gaines.

The evident sincerity of proponent's counsel and the signal skill with which they have arranged the lights and shadows of their case, so as to throw its strong points into bold relief and to obscure its

weaknesses, have at times in the course of my investigation engendered doubts and staggered the firmness of my conviction; but when I revert to the overwhelming array of circumstances above detailed they leave my mind in no doubt that the strength of proponents' cause lies in the argument of counsel and not in the cold facts of the record.

I concur in the decree.

## On Application for Rehearing.

Poché, J. The main object of appellant is to induce us to modify our decree from a final judgment to one of non-suit only.

The principal reliance is on the uncertainty of human testimony, especially in matters of handwritings. Such an argument might apply to all convictions of the human mind, based on extraneous proof, and to all human judgments.

But the issue presented by the pleadings was the genuineness of the will propounded by Mrs. Evans, and having reached the conclusion that the will was not genuine, we can find no logical middle-ground on which to rest a judgment of non-suit.

The evidence and the considerations which convinced us that the document propounded as the olographic will of Mrs. Gaines, was not genuine, in other words, that it was not in the hand-writing, either in the body or in the signature, of Mrs. Gaines, logically carries with them the conclusion that the pretended will was in the hand-writing of some other person, or, in other words, that it was a forged document.

There is no perceptible difference between the two propositions; the only distinction being that one proposition is couched in negative words, and the other in affirmative terms. Hence our decree, if it had been restricted to the declaration that the will was not genuine, and that therefore it could not be probated, would not in substance have differed from the judgment which refuses the probate because the will is a forgery.

To have said less would not have been consistent with the conclusions forced on our minds by the record, and would not have done justice to the force of the evidence which it was our duty to examine and to consider.

Our solemn conviction is that, not only has Mrs. Evans failed to show that the will which she propounds is in the hand-writing of Mrs. Gaines, but that the opponents have succeeded in demonstrating that the document is not in the hand-writing of the deceased.

The legal deduction from that fact is that the instrument is a forgery it therefore became our duty to so declare and to adjudicate ac-

cordingly.   There must be an end to litigation, and when the evidence is sufficient to justify a final judgment, courts would be derelict to their duty in refusing to give it all the legal effect it is entitled to.

But we are charged with error in simply affirming the judgment of the lower court, on the ground that the judge committed a palpable error in adjudicating that the confidential letter of August 23, 1884, is likewise a forgery.

Our attention had not been previously drawn to that feature of the judgment, and on close examination of the pleadings, we think that such an adjudication is not indispensable to the ends of justice and strictly speaking, perhaps not covered by the issue as narrowed down by the pleadings.

But we understand the reason which led the judge into that slight error; it was superinduced by the following language in appellant's first petition.   Referring to the will which was presented for probate, counsel said:

"That petitioner herewith presents said testament for probate; that she likewise produces another testament of decedent of anterior date," and the prayer of the petition is for probate of "said last will and testament," without reference to the dates of either of the wills.

The judge may therefore have had reasons to suppose that the genuineness of both wills was at issue.

But on close examination we find that Mrs. Evans did not ask for probate 'as a will of the confidential letter of August 23, 1884, and hence it is proper that it be not dealt with as a testament, or as an issue for adjudication.

What was said on the subject in our opinion is purely argumentative, and we had not then considered the fact that the district judge had treated the matter as an issue in the case.   This is shown by our concluding language, which says:   "Our solemn conviction is that the *will* propounded by Mrs. Evans *is*, not in the handwriting of Mrs. Gaines."   *   *   *   Hence it is clear that our intention was not to declare any other document to be a forgery, in our decree.   We therefore consider that those expressions in the judgment appealed from are mere surplusage.

But to remove all doubts on the subject, we shall amend the decree in that particular.   But as the proposed amendment does not alter the practical result of the litigation as settled by the judgment appealed from, it is not of the nature of amendments which in law usually entail the costs of appeal on the appellee.

A second examination of the case has satisfied us that all the conclusions of law and on the evidence contained ·in our opinion are supported by the record, by sound reason and by authority.

It is therefore ordered that our former decree be amended so as to read as follows :

The judgment appealed from is therefore amended by striking out of it that portion which adjudicates that the confidential letter of August 23, 1884, purporting to have been made by the deceased, Myra Clark Gaines, as a last will and testament, be rejected as false, fraudulent and forged and not entitled to probate, and as thus amended said judgment be affirmed. Costs of appeal to be paid by appellant.

Rehearing refused.