(92 South. 760)

No. 25113.

Succession of WADSWORTH.

(May 29, 1922. Rehearing Denied by Division C June 28, 1922.)

(Syllabus by Editorial Staff.)

1. Wills 289—Proponent has burden of proving genuineness of signature when probate opposed ab initio.

Under Civ. Code, art. 2245, and Code Prac. art. 325, relative to the probate of private signatures, where the probate of a will is opposed ab initio as a fraud and forgery, the burden of proof is on the party relying on the genuineness of the signature.

2. Wills 292—Upon contest ab initio all legal evidence admissible.

Where the probate of a will is opposed ab initio, the doors are open to both parties for the introduction of legal evidence under all the forms prevailing in all contested facts or cases.

3. Wills 288(3)—One seeking to set aside probated will has burden of proof.

Where an olographic will is ordered probated and executed on due proof of the testator's handwriting and signature, such preliminary proceedings establish the prima facie validity of the will when thereafter sought to be annulled or set aside on any legal grounds, and the burden of proof is on the one seeking to set it aside.

4. Wills 289—Failure to give notice to heirs does not shift burden of proof where contestant not entitled to notice.

The failure to give notice in writing to presumptive heirs residing in the parish before the probate of a will as required by Code Prac. art. 935, did not shift the burden of proof as to the genuineness of the signature to the proponent in a subsequent contest by one who did not reside in the parish and was not entitled to notice.

5. Wills 302(2)—Evidence held to sustain genuineness of will attacked as forgery.

Evidence held to clearly establish the genuineness of a will attacked as a forgery, notwithstanding the somewhat unusual time, place, and circumstances of its alleged execution.

6. Wills 401—Exclusion of evidence which would not have been conclusive held not to require remand.

In a proceeding to set aside a judgment probating the will of a fireman, the exclusion of the register of the fire department offered to show that testator was on duty when the will was claimed to have been made held not to require remand, where it would not have been conclusive of that fact, and there was other evidence of such alibi.

Appeal from Civil District Court, Parish of Orleans; Fred D. King, Judge.

Proceeding to set aside a judgment probating an alleged will and testament of George M. Wadsworth. From a judgment denying relief, the petitioner appeals. Affirmed.

Andre Lafargue and Pierre D. Olivier, both of New Orleans (McCloskey & Benedict, of New Orleans, of counsel), for Mrs. Eugenie Koeltz.

Woodville & Woodville, of New Orleans, for appellee.

By Division B, composed of O'NIELL, LAND, and BAKER, JJ.

LAND, J. George M. Wadsworth died in the city of New Orleans, which was his domicile, on October 24, 1918. He was unmarried, and at the time of his death his only heirs were his aunt, Mrs. Eugenie Bau-

man, wife of Bernard Koeltz, residents of Niederlauterbach, Alsace-Lorraine, in the republic of France, and several first cousins, all of whom resided in the city of New Orleans.

Mrs. Lillian Bauman, widow of William H. Norris, and a first cousin of decedent, alleging that he had died intestate, was appointed administratrix of his succession December 12, 1918, and duly qualified as such December 30, 1918. Her final account was duly homologated, and the funds ordered to be distributed accordingly on November 24, 1920. As shown by the final account and the inventory, there was a small cash balance left after the payment of all debts, and also a lot and two houses, Nos. 125 and 127 North Pierce street, city of New Orleans.

On September 28, 1921, Mrs. Lillian Bauman, administratrix of the succession of George M. Wadsworth, filed a petition in the civil district court for the parish of Orleans. alleging the discovery of a last will and testament made by George Wadsworth on the 9th day of September, 1918, bequeathing to her all of his property. She accepted his succession unconditionally, and, averring that all debts had been paid, prayed that said last will and testament be duly probated, registered, and executed, and that she be recognized as universal legatee, and be sent into possession of all of the property belonging to the estate of the testator.

The will was probated and ordered to be executed by judgment of date September 28, 1921.

On September 30, 1921, Mrs. Eugenie Bauman, wife of Bernard Koeltz and aunt of George M. Wadsworth, filed a petition in the civil district court for the parish of New Orleans attacking the last will and testament as a forgery and a fraud, and praying that the judgment probating same be declared null and void, and that she be recognized as the sole heir of George M. Wadsworth and sent into possession of all property belonging to his succession. To this petition Mrs. Lillian Bauman filed an answer, denying that the will probated was a forgery, and admitting all of the other allegations in the petition, except that she had never been discharged as administratrix of the succession of George M. Wadsworth.

The issue presented to us for decision is whether the will in question is a genuine instrument or a forgery.

Counsel assign error in that the court below held that the burden of proof was upon the opponent to establish the nullity of the alleged will. They contend that there is no difference between the will in this case and any other document under private signature within the purview of the codal provisions, where such document is attacked for forgery, and that an ex parte probate shifts the burden as to illegalities only, and not as to the existence vel non of the document.

[1] Where the probate of a will is opposed ab initio, on the ground that it is a fraud and forgery, the burden of proof is on the party who relies on the genuineness of the proffered signature. C. C. art. 2245; C. P. art. 325.

[2] Under such an issue the doors of justice are opened to both parties for the introduction of legal evidence, under all the forms which prevail in all contested facts or cases. Succession of Gaines, 38 La. Ann. 129; Plicque & Le Beau v. Labranche, 9 La. 559; Sophie v. Duplessis et al., 2 La. Ann. 724; Aubert v. Aubert, 6 La. Ann. 104; Pena v. New Orleans, 13 La. Ann, 86, 71 Am. Dec. 506.

[3] Where the olographic will is presented and due proof is administered of the testator's handwriting and signature, the will is ordered to be probated and executed. If thereafter any party seeks to annul or set aside the will on any legal grounds, he is met by these preliminary proceedings which have established the prima facie validity of the will, and under the effect of which he is

charged with the burden of proof in support of his attack. Succession of Gaines, 38 La. Ann. 127, 128; Succession of McDonogh, 18 La. Ann. 444, 445.

[4] In the present case the will of G. M. Wadsworth was probated upon the testimony of two witnesses, who deposed that the same was entirely written, dated, and signed by the testator, George Wadsworth, and that they had often seen him write and sign his name during his lifetime. The presumptive heirs, first cousins of deceased, residing in New Orleans, were not notified. This is unimportant, as they are not parties to the contest of the will in this case. Decedent's aunt, the only contestant of the will, resides with her husband at Niederlauterbach, Alsace-Lorraine, in the republic of France. While she is the nearest relation of deceased and his presumptive heir, she was not entitled to notice in writing to attend at the opening and proof of the will, as she did not reside in the parish of Orleans, the domicile of the deceased. C. P. art. 935.

The petition charging that the last will and testament of George Wadsworth was a fraud and a forgery was filed by his aunt two days after the judgment probating the will had been signed. The contest, therefore, was not ab initio.

In the case In re Succession of Mrs. Letitia Duffy Hagan, 91 South. 303,[1] No. 23960 on the docket of this court, and decided March 13, 1922, we held:

"Had the will in this case been opposed before being probated, the burden would have been upon Hagan to sustain it by proper evidence as to the genuineness of the handwriting. Being unopposed, the requirement of the law was even stronger, for it could not be probated except upon the testimony of at least two credible witnesses that it was entirely written, dated, and signed by the deceased. R. C. C. 1655. One witness would not have been sufficient, however reliable or to whatever extent he might have been corroborated. But, since it was probated, the effect was to give it a prima facie

_____
[1] 150 La. 934.

validity casting the burden of proof upon those attacking it; and, in sustaining this burden, it was permissible to show the insufficiency of the evidence under which it was probated. Succession of Myra Gaines, 38 La. Ann. 123.

"The purpose of article 935 of the Code of Practice, it would seem, in requiring that the presumptive heirs be notified of the application for probate, if they reside in the place, is to afford them an opportunity of opposing the alleged will, if they see fit; and the failure to give this notice has the effect of denying to them this timely opportunity of making such opposition, and thereby forcing upon the proponent the burden of proof. From this it follows that in a case of this kind, when the party attacking the will has shown the insufficiency of the evidence to sustain the ex parte probate proceedings, the duty then devolves upon the proponent to prove the genuineness of the will."

This decision is not applicable to the present case, inasmuch as the contestant is not a presumptive heir residing in the place, and therefore was not entitled to notice under the article of the Code of Practice cited. The failure to give such notice could not, then, have the effect of shifting the burden of proof from the shoulders of the contestant and placing it upon the shoulders of the proponent in the present case. Hence the onus probandi rests upon, and must be assumed by, the contestant.

[5] The disposition of all of his property by George Wadsworth to Mrs. Lillian Bauman, his first cousin, would have been most natural, under the circumstances of this case. She was his nearest relative, after his mother's death, residing in the city of New Orleans, where decedent also lived. He called frequently to see her. She was a widow, with a boy eight years of age, and worked for her livelihood. Decedent had told his cousin that when he died "she would not have to worry." On April 29, 1916, he made her the beneficiary of his insurance in the Fireman's Pension and Relief Fund, and this insurance was paid to her after his death. There is nothing in the testimony

to show that any estrangement of any kind had taken place between them between the date of the insurance policy, April 29, 1916, and his decease. The name of the beneficiary remained unchanged, although one of the female witnesses in the case testified that decedent was engaged to be married to her at the time of his death. His aunt, Madame Eugenie Bauman, lived in France, and had a husband to rely upon for support. His affections naturally turned to his kindred at home, and theirs seemed to him to be the greater need for his bounty.

The last will and testament of George Wadsworth is of date September 9, 1918, and he died October 24, 1918, or in a period of about six weeks after its execution.

The manner in which Mrs. Lillian Bauman, the universal legatee, came into the possession of this will, is corroborated by the testimony of Mrs. Waterloo and of Albert Singer, the brother of Mrs. Bauman. There is no evidence in the record to show that Mrs. Bauman, the universal legatee under this will, had the slightest connection with the alleged forgery of the same, or that she had any knowledge of the existence of this will at any time until her brother, Albert Singer, informed her he had found a will, and had delivered it to Mr. Woodville. Albert Singer received this will in a letter written by Mrs. Waterloo from Memphis, Tenn., where she resided. The letter is of date September 20, 1921, and was filed in evidence in the case.

Singer testifies that the first time he saw this will was about September 21, 1921, when he received Mrs. Waterloo's letter containing the instrument.

Mrs. Waterloo resided in the city of New Orleans about three years. She was living there in September, 1918. She was employed at the Cosmopolitan Hotel as a checker, and boarded at 631 Carondelet street. She was well acquainted with George Wadsworth.

He called frequently to see her and escorted her on numerous occasions to restaurants and theaters. She also knew Albert Singer, and was on friendly terms with him.

Her statement is that after returning with George Wadsworth from lunch on September 9, 1918, they went to her room on Carondelet street, and that while there Wadsworth complained of feeling badly, suffering from indigestion, and she gave him some whisky to drink. Later on he asked her for a pen and paper, and, having blotted the sheet, he called for a pencil, and wrote the will in contest in this case, and delivered it to her, with instructions to advise Albert Singer about it, if anything happened to him, the testator. Mrs. Waterloo left New Orleans shortly after this, and before the death of Wadsworth, which occurred October 24, 1918. She did not hear of his death until about September 16 or 17, 1921, when she happened to meet Paul Westwood, a New Orleans man, on the sidewalk in front of a picture show in Memphis, Tenn. When she inquired about George Wadsworth and Albert Singer, Westwood replied that Wadsworth was dead. The witness then recalled that she had this will in her possession, and immediately wrote a letter to Albert Singer inclosing it. The witness is not related to any of the parties to this suit, and there is no proof before this court that she had any pecuniary interest in the result of the issue here presented.

In referring to her testimony the trial judge said:

"The testimony of two gentlemen who identified his handwriting under oath, and the testimony of a witness for defendant who saw the testator write and sign his name, was given, and the court was very much impressed with the testimony of Mrs. F. Waterloo, now of Memphis, Tenn., her manner on the witness stand, her directness and frankness in response to the questions propounded, and the truthfulness of her testimony, and believes her uncontradicted testimony as to the genuineness of the will."

Her testimony in this case has been strongly attacked by counsel for plaintiff. It is declared by them to be highly suspicious, because of the time and place and circumstances surrounding the execution of this will. However, we cannot readily detect at all times the psychic cause that induces or impels individual action. The conduct of an individual upon a particular occasion may be unusual or even eccentric; yet it does not necessarily follow that we are justified in repudiating that which was done as incredible because suspicious. Under such circumstances we must apply the rule of reason and search the entire atmosphere of the case, in order to arrive at a just and correct conclusion.

Whether it was premonition, sudden impulse, or a belief of illness that caused George Wadsworth to write this will in the room on Carondelet street, we cannot say. His death, however, followed shortly afterwards. The testimony shows that at the time he executed this last will and testament he was engaged to be married. Whether he selected this unusual time and place of executing his will in order to conceal his mortuary dispositions from his fiancée, by placing the evidence of his bequest to his cousin in the hands of Mrs. Waterloo, or whether he feared that, if the will remained in his possession, it might become lost or mislaid, we are unable to determine.

We said in the case of Pena v. Cities of New Orleans and Baltimore, 13 La. Ann. 87 (71 Am. Dec. 506):

"Again, the document which has been brought up with the record for our inspection does not appear to have been carefully kept, as one might naturally expect; but is discolored, as if by moisture, creased as if worn in the pocket for a long time, and in parts almost illegible.

"We would have been better satisfied with some evidence explanatory of the conduct of plaintiff, so little in accordance with the usual springs of human action, at least with that most powerful of all, self-interest. We concede the suspicion which may attach to the appearance of this small scrap of paper as the title to a large fortune. But, after all, suspicions are not permitted to counterbalance, in the judicial mind, the testimony of numerous and uncontradicted witnesses. It is in the recollection of some of us that a dirty fraction of a half sheet of foolscap was a vehicle for the devise of a large fortune of the late Chief Justice Martin. A similar eccentricity in John McDonogh, which made, in his case, a bit of paper barely large enough for a promissory note the repository of an olographic will, may have communicated itself to the beneficiary of that will, and been the cause of his concealing its existence until six years after the death of the testator. We do not find in these circumstances sufficient reason for reversing the judgment of the district court."

We have the genuine signatures of the decedent to his bank card, receipts, death benefit in the Fireman's Pension and Relief Fund, reports to the fire department, etc. We have carefully compared these signatures with that to the last will and testament. We find a marked similitude between some of these signatures and the signature to this will. We also find patent discrepancies between some of these genuine signatures. This, however, would not warrant us in pronouncing any of them to be forgeries.

As we said in the Succession of McDonogh, 18 La. Ann. 444:

"All evidence of handwriting except where the witness saw the document written is presumptive and rests upon the principle of comparison, which is made in two ways, by comparing with the exemplar formed in the mind by previous knowledge, or with other writings produced on the occasion, and proven or admitted to be genuine; and at best is merely evidence of opinion, which admits of various degrees, and the weight of which is to be determined by the court."

In the Succession of Gaines, 38 La. Ann. 134, we held that, while in contestations which involve the validity of wills, as regards the genuineness of same, all legal modes of proof, including the testimony of experts and comparisons of writings, are admissible, and that all such evidence must be considered by the court, yet we added that it was

undeniably true that such testimony must yield when pitted against positive testimony.

In this case we have the positive testimony of Mrs. Waterloo, an eyewitness to the execution of this will, and a disinterested witness. Her credibility was accepted by the trial judge, who heard and saw her testify. The testimony of this witness must necessarily counterbalance the mere opinions of contestant's witnesses as to the signature of this will being forged. They were called to testify three years after the death of George Wadsworth. Some of them had very slight knowledge of his handwriting, and his fiancée, who had lost the letters written to her by deceased, may have been actuated by pique because of the disposition in favor of the cousin of the deceased, instead of in favor of herself.

The testimony of Mrs. Waterloo, whom we accept as a credible witness, is supported by a very strong circumstance, outside of the testimony of proponent's other witnesses that in their judgment the signature to the will is genuine. That circumstance is the naturalness of the disposition by deceased to his cousin, whom he had made the beneficiary of his fireman's insurance two years before his death, who had stated to proponent that he intended to provide for her in the future, and who was the godfather to her child.

The presumption of the genuineness of this will arising from the probate proceedings, the testimony of an eyewitness to its execution by deceased, the testimony of several other witnesses of proponent as to the genuineness of the signature, the apparent similitude of the signature contested with other signatures of deceased, admitted to be genuine, all corroborated by the naturalness of the bequest itself, present an array of facts which clearly establish to the judicial mind convincing proof of the genuineness of the will herein attacked.

An attempt was made in the lower court to discredit the testimony of Mrs. Waterloo by offering the testimony of the fiancée of the deceased to show that he was at the fire station during the day of September 9, 1918, the date of this will. This testimony was admitted by the court, who did not consider it as satisfactory proof of the alibi attempted to be established, and we concur in that conclusion.

The fiancée of deceased testified that he was on duty at the fire station on the night of September 9, 1918, and that she saw him there during his supper hour from 7 to 8 o'clock. This testimony, even if true, does not establish an alibi for George Wadsworth at the time of the making of this will. Mrs. Waterloo states clearly in her testimony that the will in contest was made in her room on Carondelet street a short time after George Wadsworth and herself had taken lunch at Kolb's Restaurant, and that at the time she was getting ready to accompany him to a picture show that evening.

The testimony of the fiancée of deceased is also incorrect in the statement that George Wadsworth obtained leave of absence every sixth day. Fred W. Smith, captain of the New Orleans fire department, testified to the effect that Wadsworth got off once every six days and once every eight days, and was off twenty-four hours each time. If we begin with the month of June, 1918, and calculate the days that Wadsworth was off for that month, and for the succeeding months of July and August and September, we find that he was off June 7, June 17, June 25, August 5, August 13, August 23, August 31, and September 9, the date of the making of this will.

He was off August 31, and returned to the fire station that night. This time he had to serve eight days without leave, instead of six days. So he was off again the night of September 8 for twenty-four hours, which ended the night of September 9, 1918.

The fiancée of deceased, while endeavoring in her testimony to show that George Wads-

worth was on duty at the fire station on September 9, 1918, and had a leave of absence only every sixth day, testifies that Wadsworth took her to a picture show between 7 and 8 o'clock on the night of September 9, 1918, and again on the nights of September 10, 11, and 12.

[6] As September 9 was the day upon which Wadsworth had a leave of absence, and as his fiancée testified that she found him at the fire station on the night of September 9 between 7 and 8 o'clock engaged in eating his supper, he necessarily signed the register at the fire department that night, when he returned and reported for duty. The fact, therefore, that his name may appear upon the books of the fire department on September 9, 1918, cannot furnish proof of an alibi for Wadsworth during the entire day. The refusal of the trial judge, therefore, to admit the register of the fire department in evidence on the trial of this case, was harmless error, of which contestant cannot justly complain.

Hence we see no good reason for remanding this case for the reception of such documentary evidence, especially as other witnesses testified as to the alibi on the trial of the case in the lower court.

The judgment appealed from is therefore affirmed at the cost of appellant.

O'NIELL, J. I concur in the decree affirming the judgment appealed from, because the evidence as a whole leaves no doubt in my mind that the will is genuine. But I do not concur in the opinion that an ex parte order admitting an instrument to probate as an olographic will, without notice to the presumptive heir or heirs, shifts the burden of proof regarding the genuiness of the handwriting.

Rehearing refused by Division C, composed of Justices DAWKINS, ST. PAUL, and THOMPSON.