there is found a lacuna which must be bridged; and that is what is happening in the present case. This same lacuna was bridged in the Successions of Thompson and Loeper, and we have simply used this bridge.

Rehearing refused.

MONROE, C. J., takes no part.

---

(72 South. 822)

No. 20444.

WATTS et al. v. COLLIER, Sheriff, et al.

(June 29, 1914. On the Merits, April 24, 1916. On Rehearing, Oct. 30, 1916.)

*(Syllabus by the Court.)*

1. EVIDENCE ⨂⟶596(1)—DOCUMENTARY EVIDENCE—SIGNATURE.

In a suit depending upon the genuineness of the signature to a private writing, if the alleged signer disavows the signature, the burden is on the party relying upon the instrument to prove the signature by a preponderance of evidence.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2446; Dec. Dig. ⨂⟶596(1).]

2. APPEAL AND ERROR ⨂⟶842(9) — REVIEW — SCOPE AND EXTENT.

Whether the proof of the genuineness of a disputed signature on a private writing conforms with the requirements of article 325 of the Code of Practice and article 2245 of the Civil Code involves a question of law as well as a question of fact.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3328; Dec. Dig. ⨂⟶842(9).]

3. EVIDENCE ⨂⟶596(1) — DOCUMENTARY EVIDENCE—AUTHENTICATION—SIGNATURE.

Where the private writing bears a cross mark purporting to represent the signature of the alleged obligor, the uncorroborated testimony of one witness that he saw the alleged obligor make the cross mark or hold or touch the pen with which it was made cannot prevail over the denial of the latter on oath.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2446; Dec. Dig. ⨂⟶596(1).]

On Rehearing.

4. HOMESTEAD ⨂⟶181(1, 2) — WAIVER — EVIDENCE—BURDEN OF PROOF—SUFFICIENCY.

When, in a proceeding to enforce an alleged waiver by a wife, of her homestead, to which her "mark," instead of her written signature, appears to be attached, the wife denies that she made the mark, the plaintiff in the proceeding is not restricted to the proof required by article 325 of the Code of Practice, which is inapplicable in such case; nevertheless, the burden of proving the genuineness of the mark rests upon him who asserts it, and, in view of the facts that a mark may be forged more readily than a written signature, and that the person who binds himself thereby may, by reason of his illiteracy, more readily fall into error, or be deceived, the proof in such case should leave no reasonable doubt in the mind as to the fact to be proved.

[Ed. Note.—For other cases, see Homestead, Cent. Dig. §§ 351, 352; Dec. Dig. ⨂⟶181(1, 2).]

*(Additional Syllabus by Editorial Staff.)*

5. APPEAL AND ERROR ⨂⟶382 — PROCEEDINGS FOR TRANSFER OF CAUSE—BOND.

Under Code Prac. arts. 574, 575, requiring the bond for a devolutive appeal to be in an amount fixed by the judge and the bond for a suspensive appeal to be in an amount exceeding by one-half the amount for which the judgment was given, where a party takes both a suspensive and devolutive appeal, the bonds therefor may be cumulated in a single bond in the sum of the amounts required in each appeal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2038, 2039; Dec. Dig. ⨂⟶382.]

6. APPEAL AND ERROR ⨂⟶465(1) — PROCEEDINGS FOR TRANSFER OF CAUSE—BOND.

Under Code Prac. art. 575, requiring the bond for a suspensive appeal to be in an amount exceeding by one-half the amount for which the judgment was given, costs are not included in the judgment in computing the amount of the bond.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2235–2238; Dec. Dig. ⨂⟶465(1).]

Appeal from Third Judicial District Court, Parish of Claiborne; William C. Barnette, Judge.

Action by Prote Watts and another against B. T. Collier, Sheriff, and others. From a judgment for defendants, plaintiffs appeal. Reversed and rendered.

Richardson & Richardson, of Homer, for appellants. Moore & Walker, of Homer, and Chappuis, Menefee & Fortier, of New Orleans, for appellees.

On Motion to Dismiss.

PROVOSTY, J. [5] By articles 574 and 575, C. P., the bond to be given for a devolutive appeal must be in an amount fixed by

the judge, and the bond to be given for a suspensive appeal must be in an amount "exceeding by one-half the amount for which the judgment was given."

The appellant in this case obtained orders for both a suspensive and a devolutive appeal. The judgment being for $35, he made the amount of his suspensive appeal bond $52.50, that is to say, $35, the amount of the judgment, plus one-half of that sum and he made the amount of his devolutive appeal bond $75, as fixed by the judge. He cumulated the two bonds in one for $130 for the two appeals. This cumulation is allowable, since a bond, though purporting to have been given for the one appeal, may be good for the other.

[6] Appellee has not objected to this cumulation, but has moved to dismiss the suspensive appeal, on the ground that the costs form part of the judgment, and that therefore the costs should have been added to the judgment in computing the amount of the suspensive appeal bond, and that the amount of the costs in this case is $75, since the judge fixed the amount of the devolutive appeal bond (which bond is given for the costs) in that sum.

The question of whether the costs must be added, in computing the amount of the suspensive appeal bond, came before this court in Brown v. Brown, 9 La. Ann. 310, and again in Paland v. Railroad Co., 42 La. Ann. 290, 7 South. 899, and was decided in the negative. And in State ex rel. v. Judge, 29 La. Ann. 776, this court said that "jurisprudence and long uniform practice have settled the interpretation"; that the costs are not required to be thus included.

In the decisions cited by appellee, in support of the motion to dismiss, this question was not involved. Thus, in State ex rel. v. Judge, 21 La. Ann. 64, the sole question was as to whether the suspensive appeal bond to be given in the case should have been in an amount fixed by the judge or in an amount "exceeding by one-half the amount" of the judgment. In Moussier v. Gustine, 25 La. Ann. 36, the ground of the motion to dismiss was not that the costs had not been included in the computation of the amount of the bond, but that "the surety on the appeal bond was the same person who was surety on the injunction bond." What the court decided in Malain v. Judge, 29 La. Ann. 793, was that in a case where a moneyed judgment has been enjoined, and the injunction has been dissolved with damages, it is the judgment appealed from—namely, that dissolving the injunction—that regulates the amount of the suspensive appeal bond, and not the enjoined judgment. And, in like manner, the point decided in State ex rel. v. Judge, 35 La. Ann. 1174, was that, where the collection of taxes has been enjoined, and the injunction has been dissolved, the enjoined taxes are not required to be included in the amount of the suspensive appeal bond. True, the court in making its ruling in those cases used the expression that the suspensive appeal bond would have been sufficient if given for the capital, interest, and costs of the judgment appealed from; but this expression, as bearing upon the question whether or not costs have to be included in a suspensive appeal bond, was the merest obiter, as that question was not involved in those cases, and, as shown hereinabove, that question has been expressly decided the other way in several cases.

The motion to dismiss is overruled.

## On the Merits.

O'NIELL, J. The plaintiffs, Prote Watts and his wife, Boxie Watts, have appealed from a judgment denying their claim to a homestead exemption and dissolving a writ of injunction whereby they had arrested the seizure and sale of a tract of about 7¼ acres of land. The seizure was made by virtue of

a writ of fieri facias, pursuant to a judgment obtained by the defendant, A. McCranie, on a written acknowledgment of debt and confession of judgment. The instrument is dated the 1st day of December, 1908, is for $175.06, bears interest at 8 per cent. from its date, and contains the obligation to pay 10 per cent. as attorney's fees in the event it should be placed into the hands of an attorney for collection, and a waiver of "all homestead exemptions allowed under articles 244, 245, 246, and 247 of the Constitution of 1898."

The collector employed by Mr. McCranie wrote the name, Prote Watts, at the end of the instrument, and Prote Watts made a cross mark between his names, or touched the pen as evidence of his approval when the collector of the payee made the cross mark. Below the signature is written what purports to be a waiver of the homestead exemption by Boxie Watts, wife of Prote Watts, declaring merely that she did "consent and agree to the [above] waiver and sign the same of her [my] own consent and without any marital influence." The collector in the plaintiff's employ also wrote the name, "Boxie Watts," made another cross mark, and wrote the words "her mark," beneath which the collector wrote, "I authorize my wife to sign above," and wrote the name, "Prote Watts," with another cross mark and the words, "his mark." To the left of what purports to be the last signature on the instrument, the writer signed his name as the only attesting witness.

The injunction was obtained on the denial of the plaintiffs that the wife, Boxie Watts, had made the cross mark, purporting to represent her signature, or held or touched the pen with which it was made by the defendant's employé. It is conceded that the plaintiffs are entitled to the homestead exemption if it was not waived.

The plaintiffs and their daughter, who were all present at their residence on the occasion when Prote Watts made his mark on the instrument, or touched the pen, swore that Boxie Watts did not make her mark nor touch the pen. They are contradicted only by the defendant's employé who wrote the names on the instrument.

[2] The appellee's counsel contend that the only question presented to this court for decision is one of fact, on which the judgment of the district court is not manifestly erroneous and should not be reversed. The first question to be decided, however, is whether the proof of the signature that was denied under oath complied with the requirements of the law, and that is a question of law.

[1, 3] Articles 2244 and 2245 of the Civil Code require that the person against whom an act under private signature is produced must either avow or disavow his signature, and that, if he disavow it, it must be proved by *witnesses* or comparison, as in other cases. Articles 324 and 325 of the Code of Practice also require that, when a demand is founded on an instrument under private signature, the defendant, in his answer, must expressly acknowledge or deny his signature, and that, if he deny it, the plaintiff must prove its genuineness, by *witnesses* who have seen the defendant sign the act, or who know his signature from having frequently seen him write and sign his name. The latter article contains a *proviso* that the proof by *witnesses* shall not exclude proof by experts or by comparison of the writing, as provided in the Civil Code.

In the case of Ball's Administrators v. Ball, 15 La. 179, in Davis v. Police Jury, 19 La. 541, and in Temple v. Smith, 7 La. Ann. 562, it was held that the articles of the Civil Code and Code of Practice cited above are *not confined to cases where the disputed instrument is the immediate basis of the suit*, but apply also to cases where the instrument is offered in evidence on an incidental ques-

tion. Hence the law must have application to an instrument of such importance as a waiver of the homestead exemption, an exemption of public policy that can be waived only by a written instrument, as prescribed in the Constitution.

In view of the fact that, in the Digest or Code of 1808, article 226 of title III required only the testimony of "at least one credible witness," swearing that he had seen the party sign the instrument, the requirement of the Civil Code of 1825, of the Revision of 1870, and of the Code of Practice, that a disputed signature must be proved by *witnesses*, when the testimony relied upon is of eyewitnesses to the signing, is significant. It leaves a strong inference, if in fact it does not expressly declare, that, when there is no proof of the genuineness of the handwriting, by witnesses familiar with the writing, by experts or by comparison, the testimony of only one witness that he saw a certain person sign the instrument will not prevail over the denial of that person under oath; because the word "witnesses" is in the plural wherever it is used in these articles of the Codes.

In the case of Robinson v. Arnet, 15 La. 262 (decided in 1840), construing the articles of the Codes on this subject, it was held that the defendant's denial of his signature of the promissory note on which he was sued required much stronger evidence to warrant a recovery by the plaintiff than in an ordinary case of a general denial. The question of the sufficiency of proof in the case cited was regarded as one of law rather than of fact, and the verdict of the jury in favor of the plaintiff was set aside on the ground that the proof of the genuineness of the signature was not sufficient. That decision was quoted with approval in Huddleston v. Coyle, 21 La. Ann. 148, where it was said that, when the defendant denied that the note sued on bore his signature, the burden of proof was on the plaintiff to prove the genuineness of the signature by such evidence as was re-

quired by article 325 of the Code of Practice. There again it was held that the question of sufficiency or insufficiency of proof in such case involved both a question of law and a question of fact; and the judgment of the district court in favor of the plaintiff was reversed because the evidence did not satisfy the requirements of the law. That decision was cited with approval in the Succession of Leonard, Opposition of Sullivan, 21 La. Ann. 523. And both cases were cited in Pinckard, Steele & Co. v. Hampton, 22 La. Ann. 440, where it was held that the testimony of one witness that he had seen the defendant sign the instrument, with the testimony of another witness that he was familiar with the defendant's handwriting and knew the disputed signature to be genuine, was a sufficient compliance with article 325 of the Code of Practice. It was said that the law did not require the testimony of two witnesses who had frequently seen the party write and sign his name, and that the articles of the Codes had not been so interpreted in Huddleston v. Coyle, nor in the Succession of Leonard. The two cases last mentioned were again cited and affirmed in Ticknor v. Calhoun, 29 La. Ann. 279, where, in a suit against an absentee, whose curator ad hoc, in his answer to the suit on a written instrument, denied the absentee's signature, it was held that the plaintiff should have produced the same strict proof required by article 325 of the Code of Practice, as if the absentee in person had denied the signature under oath.

In James v. Rand, 43 La. Ann. 179, 8 South. 623, citing Robinson v. Arnet, and Huddleston v. Coyle, supra, it was held that the plaintiff was required to produce the proof required by article 325 of the Code of Practice in a suit for a personal judgment on a promissory note, even though the note was secured by, and identified with, an authentic act of mortgage.

In each of the cases cited above, the instrument in contest bore what purported to be the signature, not the cross mark, of the person who denied having signed it; and the construction put upon the articles of the Code of Practice and Civil Code was more strict than is necessary to maintain the appellant's contention in the case before us. The verity of a signature made with a cross mark, or by holding or touching the pen with which some one else wrote the name, is susceptible of proof by only one of the means prescribed by the articles of the Code of Practice and Civil Code. Such a signature, of itself, furnishes no evidence at all, because its verity cannot be established by comparison of handwriting, nor by the testimony of experts or of witnesses familiar with or having knowledge of a certain handwriting.

Our conclusion is that the uncorroborated testimony of only one witness cannot prevail over the denial on oath of the alleged obligor, to prove that he or she signed the disputed obligation by making a cross mark or by holding or touching the pen with which his or her name was written by some one else. To hold otherwise would imply that the requirements of articles 325 of the Code of Practice and 2245 of the Civil Code are entitled to no consideration whatever, and that the defendant's denial on oath may be disregarded. The law relieves us of the necessity of passing judgment on the veracity of the witnesses.

The judgment appealed from is annulled and reversed, and it is adjudged and decreed that the exemption from seizure of the plaintiffs' homestead be recognized, and that the injunction issued herein be perpetuated, at the cost of the defendant.

### On Rehearing.

MONROE, C. J. [4] Article 2245 (2241 of the Code of 1825), under the title "Of Acts under Private Signature," reads:

"If the party disavow the signature, or the heirs or other representatives declare that they do not know it, it must be proved by witnesses or comparison, as in other cases."

Article 325 of the Code of Practice (also dealing with acts under private signature) declares that:

"If the defendant deny his signature in his answer, or contend that the same has been counterfeited, the plaintiff must prove the genuineness of such signature, either by witnesses who have seen the defendant sign the act, or who declare that they know it to be his signature, because they have frequently seen him write and sign his name. But the proof by witnesses shall not exclude the proof by experts or by a comparison of the writing, as established by the Civil Code."

It is well settled in our jurisprudence that the ordinary mark of a person, incapable of writing, when established by legal evidence, is to be taken as his signature. Tagiasco et al. v. Molinari's Heirs, 9 La. 512; Madison v. Zabriski, 11 La. 247; Board v. Campbell, 48 La. Ann. 1546, 21 South. 184.

In the case first above cited, it appears that, in opposition to the title (to immovable property) set up by plaintiffs, a certain counter letter, purporting to bear the ordinary mark of the person by whom it was said to have been executed, was offered and admitted in evidence, over the objections, among others, that such an instrument was invalid unless signed with the name of the maker, and that testimonial proof of the signatures of the witnesses was inadmissible as tending to establish the mark of the obligor, who, as well as the witnesses, was dead. In the course of the opinion it was said:

"The fact of the counter letter adduced in the present instance having been made in writing cannot be denied, yet its validity and genuineness depends on proof, and in all cases where these things are established by legal evidence, instruments signed by the ordinary mark of a person incapable of writing his name ought to be held as written evidence, in the administration of justice, according to the rules of evidence by which the courts of this state have been governed ever since the country became an integral part of the United States. These rules have been borrowed in great part from the English law. * * * Now, according to those rules, thus adopted, the ordinary mark of a party

to a contract places the evidence of it on a footing with all private instruments in writing. * * *. As to what has been customary, we find testimony which goes to establish the fact that writings under private signatures, have both before and since the adoption of the Civil Code, been received as written acts, when they have only the ordinary mark of the parties, if made before two witnesses."

And it was held, in view of the fact that the maker and witnesses were dead, that the genuineness of the counter letter could be established by parol evidence of the signatures of the witnesses, and that they were persons of good character who would not attest a forgery. The case was not one in which there was a denial of signature, and, as we assume, was not regarded as falling within the provisions of C. C. 2241 (now 2245) or C. P. art. 325, since neither of those articles is mentioned by the court, and the opinion is quoted as showing that an instrument to which the ordinary mark of a person was affixed was considered by the court as upon the same footing, quoad the evidence required for its establishment, as other private instruments in writing, and that it was understood that such instruments (i. e., those to which marks were attached) were received "if made before two witnesses."

In Plicque & Lebeau v. Labranche, reported in the same volume (9 La. 559) the codal provisions above mentioned are expressly construed and applied. The action was brought on a promissory note against an alleged indorser, who denied his alleged signature, asserting that it was forged. The trial court admitted parol evidence to the effect that the defendant had admitted that the signature was genuine. The court, through Martin, J., said:

"It appears to this court that the district judge erred in his decision. In ordinary cases, the acknowledgment of the party is, indeed, in the nature of evidence of the truth of the signature. But it is the very weakest species of evidence that may be adduced. The witness who testifies to the acknowledgment is placed beyond all danger of being convicted of perjury, and it is almost impossible to contradict him. When, therefore,

a signature is specially denied by the party to whom it is imputed, that weak species of evidence, of his acknowledgment or admissions, is not allowed. The law has expressly provided the kind of evidence which may be produced to counterbalance the express denial of a signature to an obligation or act under private signature."

Reference is then made to C. P. arts. 324, 325, and the opinion proceeds:

"The foregoing provisions of our law repel the idea that the signature of the defendant may be proved by witnesses who only testify to his acknowledgment of such signature. Article 325 of the Code of Practice, already cited, modifies and supersedes the provision in the Louisiana Code, article 2241, which declares that if the party disavows his signature, it must be proved by witnesses, as in other cases."

In Bissell et ux. v. Erwin's Heirs, 10 La. 524, it was said:

"We are of opinion that the court did not err, in refusing to permit the alleged receipt of Erwin, for the price and rent, to be read to the jury. The report of the experts did not sufficiently prove it to be genuine, and under the circumstances of this case strict proof should be required, according to the principles settled by this court in the case of Plicque & Lebeau v. Labranche, 9 La. 559."

In Montelius & Fuller v. Cloman & Harrell, 16 La. 379, defendants were sued on what purported to be a partnership obligation. Harrell was cited through a curator ad hoc, who denied the signature. Cloman, cited personally, also denied the signature. Two witnesses were permitted to testify that "Cloman admitted the note to be genuine, and that it was a partnership transaction, and that he was liable to pay the money," and it was held by this court that the case differed from that of Plicque & Lebeau v. Labranche, that Cloman was properly condemned, and that a judgment of nonsuit was properly entered as to Harrell.

In Harris v. Patten, 2 La. Ann. 217, plaintiff sued on a private act alleged to have been signed with an ordinary mark in the presence of two witnesses, who were living, but who resided out of this state, which mark appears to have been disavowed, and he proved only the signatures of the witness-

es, and did not prove that of the defendant. The court said:

"When a signature is disavowed, article 2241 (now 2245) of the Civil Code, requires it to be proved by *witnesses*, or *comparison of handwriting*. Proving the signatures of the subscribing witnesses, satisfies neither of these requisitions." (Italics as in the opinion.)

Segond, Agent, v. Roach, 4 La. Ann. 54, was a suit on a lost note, in which defendant set up that it was forged.

The court, after quoting C. P. art. 325, said:

"This article was considered in the case of Plicque v. Labranche, which was an action against an indorser who disputed his signature. The note was in existence. Evidence to prove the verbal acknowledgment of Labranche that the indorsement was in his handwriting, was offered by the plaintiff, objected to by the defendant, and received by the court below. Upon appeal it was held, Martin, J., acting as the organ of that court, that the evidence was inadmissible. The article of the Code, thus interpreted, is in derogation of the general law of evidence, and must therefore be strictly construed. It must not be extended beyond those ordinary cases to which it clearly applies, and which alone are to be considered as contemplated by the lawgiver. But the case before us is out of the ordinary category. Here the note has been destroyed, a circumstance not presented in any of the cases cited. But the defendant argues that, even where the note has been destroyed, it is still possible to meet the requisitions of the Code of Practice. This is true, but it is not the whole truth. The holder of a lost note might perhaps have the good fortune to find witnesses acquainted with the party's handwriting, who had seen the note before its destruction, or persons competent to act as experts who had seen the note. But it is obvious that, in most cases, the owner would be put at a disadvantage by the destruction of the note. The range of his evidence would be much circumscribed. He would be restricted to witnesses who had seen and examined the note before its destruction, while in cases where the instrument existed and could be produced, he would have the range of the entire parish for experts, and of the whole state, or Union, or foreign countries, for witnesses to prove the handwriting. We cannot strain the rule of the Code to a case thus out of the ordinary category, and where the ends of justice might be defeated by limiting the plaintiff to a class of witnesses who, perhaps, could not be found. There was therefore no error in the ruling of the court below. On the merits, the case stands thus: The plea of forgery is met by the testimony of two witnesses, whose character has not been impeached. They prove the presentation of the note to the defendant after its maturity, and her recognition of its genuineness. They prove, also, that goods furnished to her plantation were the consideration of the note, and that the objection made by her to paying it, when presented, was her belief that it had been already paid. Facts sworn to by other witnesses corroborate the statements of these two witnesses. This testimony the jury believed. It satisfied them that the note was genuine, and they found a verdict for the plaintiff. The district judge refused a new trial."

And the verdict and judgment were affirmed.

In Chaffe v. Cupp, 5 La. Ann. 684, defendant was sued on five notes to which it was alleged that he had affixed his mark, and he suffered judgment by default to be confirmed in proof that he had acknowledged four of the notes. The signature of "the witness" to the other was proved, and it was also proved that the witness was dead. It was held on appeal (Slidell, J., dissenting) that evidence as to the character of the witnesses was unnecessary, and that plaintiff was entitled to judgment. The court said:

"In this case the defendant, sued upon a note which was genuine or forged, suffered a judgment by default to be given against him, and the evidence to be received without opposition. The evidence being before him under these circumstances, and probably knowing the parties, the district judge considered it conclusive that the amount of the note was due, as in Tagiasio's Case, the document, being admitted, was decisive of the cause. If the judgment of the district court had been otherwise, we would not have disturbed it, believing it a case peculiarly subject to his decision. We cannot say he erred, but, on the contrary, believed the note, being in evidence without objection, proved the debt. * * *"

Slidell, J., dissenting, said:

"In respect to this peculiar class of instruments, it seems to me courts, in admitting secondary evidence, should be careful to require as great an extent of testimony as can, with reasonable diligence, be obtained, the danger of forgery being so much greater in such cases, and I may add, of error or mistake, in consequence of the illiterateness of the person purporting to be bound. It must be conceded that the proof that the subscribing witness was a man of good reputation would greatly aid in satisfying the mind. I think the tenor of our decisions and practice goes to require that extent of evidence, and I believe it would be a safe rule to do so."

In Huddleston v. Coyle, 21 La. Ann. 149, defendant denied her signature to the note upon which she was sued, and the court (quoting from Plicque & Lebeau v. Labranche, supra) said:

"The law has expressly provided the kind of evidence which may be produced to counterbalance the express denial of a signature or the averment that it is counterfeited."

And it was held that the evidence required by C. P. art. 325, had not been produced.

In Succession of Leonard, 21 La. Ann. 523, the succession was sued on five notes said to have been signed by the decedent, and the administrator denied that they were so signed. The court quoted articles of the Code of Practice 324 and 325, and said:

"There are, * * * three kinds of proof by which a denial of signature may be overcome: First, the proof of witnesses who have seen the act signed; second, the proof of witnesses who know the signature, having frequently seen the defendant write and sign his name; third, the proof by experts or comparison of the writing. * * * The opponent has not attempted to introduce the proof of witnesses who knew the signature, nor the proof of experts, etc. He has, however, introduced the proof of a witness who saw the deceased sign the note for $250, which is a compliance with the law. * * * The opponent has only proved the signature to the note for $250, which should have been allowed and placed on the tableau."

And there was judgment accordingly.

In Pinckard, Steele & Co. v. Hampton, 22 La. Ann. 439, defendant was sued on a draft, the signature of which he did not admit, but alleged that he believed it to be forged, and the court, limiting the inquiry to the question of its genuineness, vel non, said:

"One witness swears that he was present when the draft was executed by defendant. Two other witnesses, plaintiffs, say that, 'under false representations on the part of the defendant, the goods were shipped. After they were shipped, the draft sued on was given us by the defendant, with a pledge that he would send us cotton to pay the draft.' And a fourth witness swears that he 'has often seen defendant write his name; that he is very familiar with his signature; has known him for 20 years; says he believes the signature to the draft sued on to be Wm. Hampton's genuine signature.'

"The defendant contends that the law is imperative in requiring that at least two witnesses must swear that they *know* the signature, because they have frequently seen him write and sign his name. And he refers to two decisions in 21 La. Ann. 148, 523, to sustain this position. Those decisions simply affirm that article 325 of the Code of Practice provides how the plaintiffs shall prove the genuineness of defendants' signatures when they are denied. Neither those decisions nor the Code affirm the doctrine contended for by defendant. In this case, one witness proves the signature, and his knowledge is derived from having been present when the party signed it; another witness proved the genuineness of the signature from his knowledge of the signature of the defendant, though he did not see him sign the draft in question. We think this a compliance with article 325 of the Code of Practice."

Considering the fact that C. P. art. 325, requires that the plaintiff in the case there stated shall prove the signature of the defendant by "witnesses," who have seen it signed, or who know it because they have frequently seen defendant write and sign it, we adhere to the view that, in such case (i. e., in any case falling within the meaning of the article) there should be not less than two witnesses who are able to verify the signature, either in the one way or the other, and, under the last paragraph of the article, such testimony may be corroborated by the testimony of experts, or by comparison of handwriting, as provided by the Civil Code.

Our reconsideration of this case has, however, led us to the conclusion that it does not fall within the meaning of article 325 of the Code of Practice, but is rather within the principle enunciated in the case of Segond, Agent, v. Roach, supra, according to which the article in question was held not to cover the case of a lost note; for, if the article be inapplicable in the case of a lost note, because of the probable inability of the holder to find witnesses who, having seen it before the loss, could verify the signature from memory and from having frequently seen the alleged maker write and sign his name, a fortiori, is it inapplicable in case of a note bearing only a mark, which could not be verified in that way, even though the note were not lost. The article clearly contem-

plates a case in which the holder of the instrument shall have the opportunity of proving the denied signature in either, or both, of the specified ways, and, as was held in the case cited, cannot be strained to reach a case in which one of those ways is excluded.

It is no doubt true, as was said in the dissenting opinion in Chaffe v. Cupp, supra, that, by reason of the illiterateness of a person who binds himself by a mark, rather than a written signature, the danger of error and forgery is greater in the one case than the other, and the safeguard provided by C. P. art. 325, is more needed in the case of the mark. But the question of the need is for the General Assembly to consider. The function of this court is to determine, not what might be done, but, what has been done, or intended to be done, by the General Assembly, and our opinion, as to the matter under consideration is that the article which we are called on to interpret is highly special, is in derogation of the general law of evidence, and, considered with reference to its terms and its consequences, cannot be applied, either as a whole or by dividing it, to instruments the parties to which appear to have bound themselves by their "ordinary marks," rather than by their written signatures, and hence that other evidence than that contemplated by said article was admissible to establish the genuineness of the instrument sued on.

We are also of opinion, however, for the reasons which have been stated, that is to say, because the danger of the forgery of a mark and of imposition upon the illiterate person who binds himself in that way is greater than in the case of one who is able to write his signature and to read and understand what he signs, that, where the alleged maker of a mark (and particularly where the mark is invoked to deprive him of his homestead) denies that he made it, the evidence relied on in support of its genuineness should be of a character to leave no reasonable doubt in the mind upon that point, and that evidence we fail to find in this case. The case for the holder of the note sued on (defendant in injunction) rests upon the testimony of a single witness, which is wholly uncorroborated and flatly contradicted by the testimony of two witnesses for the plaintiffs in injunction.

Defendant's witness (Mr. Bridgeman) testifies that he was working for defendant, McCranie, when, on December 1, 1908, the note sued on was given; that Watts had fallen behind in his account, and that McCranie told him to go out to Watts' place and get him and his wife to sign the note and waiver of homestead; that he went to the place accordingly on December 1, 1908, and presented the note and waiver for signature; that Watts signed the note and the authorization to his wife, and that the wife, after hesitating for a while, signed the waiver; that, under McCranie's instructions, he told them that, unless they so signed, McCranie would make them no further advances of supplies; that the note was given for the debt then due, and, after it was given, McCranie continued to make the advances. He further testifies that he next went to the Watts' place on January 12, 1912, with a similar note and waiver, and that Watts affixed his mark, as then requested, but that his wife refused to affix her mark to the waiver, and that McCranie thereafter made them no advances of supplies. It appears, however, that he carried the second note away with him, and it was filed in evidence on the trial. The whole testimony given by Mr. McCranie reads as follows:

"Q. You heard Mr. Bridgeman's statement that he conveyed this note to you, after it was signed? A. Yes, sir. Q. Did you or not refuse to sell goods to Prote Watts after his wife refused to sign the note? A. Yes, sir; that ceased our business relations. Q. Mr. Bridgeman's

statement about conveying the note to you was correct?  A. Yes, sir."

Watts and his wife both admit that Bridgeman called at their place twice, but they and their daughter, Fannie, concur in fixing the date of one of the visits as in July, and say that Bridgeman was then accompanied by a boy, believed to be his nephew, who went into the yard with Boxie (the wife) and got some of the peaches which were then ripe. The three witnesses deny that Boxie signed any paper at that time, or that anything was said about her signing, and, though Bridgeman speaks of having made the two visits, in December, 1908, and January, 1912, respectively, he does not deny having made the visit in July, accompanied by the boy, when the peaches were ripe, or explain what was done on that occasion.

The three witnesses for plaintiff deny that Boxie signed any paper upon the occasion of either of the two visits which they admit that Bridgeman made (and by "signed" we mean, affixed her mark, as both Watts and his wife are illiterate old negroes, who are incapable of writing their names), but we dismiss the testimony of the daughter upon that subject, save in so far as it relates to visit in July, since it shows that she had no definite knowledge of any other.  Prote and Boxie Watts are, however, conceded to have been present at all the visits, whether two or three, that were made by Bridgeman, and they positively deny that Boxie signed upon either occasion. Their testimony is, in some respects, open to criticism, and Prote very frankly testifies that upon one of the occasions he endeavored to circumvent Mr. Bridgeman by pretending to touch the pen for the making of his mark when in reality (Mr. Bridgeman's attention being distracted for the moment) he did not touch it, a maneuver which he seems to have thought warranted him in shuffling somewhat in his testimony as to whether he had signed both of the notes which have been produced or but one.  There is no suggestion in the testimony, or elsewhere in the record, that Boxie was ever advised that any paper to which she is said to have affixed her mark contained a waiver of her homestead, and, beyond the bare statement of Bridgeman, to the effect that McCranie continued to furnish supplies to Watts after the giving of the note of December, 1908, the record is silent as to the relations which subsisted between the Wattses and McCranie from the date thus mentioned and January 12, 1912.  It is, of course, possible that McCranie, whom we take to be a country merchant, made advances of supplies to Watts prior to December 1, 1908, without security of any kind, or even a note of hand, and demanded the note, with the waiver of homestead, only after the debt had become due and the Watts' crop, such as it may have been, had passed beyond his reach, but transactions of that kind appear to us to be unusual, and where, as in this case, a homestead is said to have been waived by an ignorant old negro woman for a debt for which she was not bound and for which the homestead could not have been seized, even as against her husband, it looks to us as though, if done at all, it must have been done through ignorance.

Counsel for defendant say, in their brief:

"We submit that his [Bridgeman's] testimony is corroborated by the other facts of the case, and to a large extent even by the testimony of one of the defendants.  The undisputed facts are these:  Prote Watts had been trading with A. McCranie, and had fallen behind in his supply account.  Mr. McCranie sent Mr. Bridgeman out to take a note, with a homestead waiver, for this balance, and the defendant, Prote Watts, did sign the note, and made Mr. Bridgeman believe he was signing the authorization to the waiver by placing his fingers around the pen, but not touching it.  It would be silly to presume that Mr. Bridgeman was having Prote Watts sign authorization of the waiver of his wife, Boxie Watts, when she was refusing to sign the same.  It is further shown that, the next year, Prote Watts and his wife, Boxie Watts, fell behind in their supply account, and that a note for that balance, with a homestead waiver, was requested by Mr. McCranie, and that the wife, Boxie Watts, refused to sign the waiver, and was told, as she had been the year before, that unless she signed the waiver, Mr.

McCranie would not furnish them further with supplies. She refused, and Mr. McCranie did not furnish them any further."

The counsel probably prepared their brief (being the brief on the application for rehearing) without having the transcript before them, and have fallen into some errors as to its contents. Prote Watts' testimony as to the deception practiced on Mr. Bridgeman, as we understand, relates to his signature to the note, and not to the authorization. It reads, in part, as follows:

"Q. Prote, you state that once—you thought it was the first time—when he came for you to sign the note, you never signed it; you made Mr. Bridgeman think you signed it, but didn't really sign it; is that right? A. Yes, sir. Q. How did you do that? A. He wasn't noticing what I was doing; he had the pen, and—I don't know what he was doing; he wasn't noticing—and I held my hand just this way (witness holds fingers in circular position, as though around something), and I didn't touch it, and my old lady told me— Q. Don't state what the old lady said. A. I just held my hand this way, and didn't touch it. Q. You mean by that that you held your fingers around the pen, but didn't touch it? A. I didn't touch the pen; yes, sir. Q. Was that when Bridgeman was making your mark for you? A. That was when he was wanting to make the mark. Q. He thought you were touching it, and you weren't touching it? A. No, sir; I wasn't touching it."

The first note is shown to have been dated December 1, 1908, and the second, January 16, 1912. It was not therefore "the next year" (as counsel state) after the giving of the first note that the second was requested, nor does the evidence show that the Wattses were behind in their supply account when, in January, 1912, that request was made.

We adhere, therefore, to the view that the testimony of Mr. Bridgeman lacks corroboration, and we conclude that, being both contradicted and uncorroborated, it fails to discharge the burden imposed upon the defendant in injunction of proving the genuineness of the homestead waiver upon which he relies.

The decree heretofore handed down is therefore reinstated and made final.

O'NIELL, J., concurs in the decree.