**SOUTHERN LANDS, Inc., et al. v. HENDERSON et al.**

No. 770.

District Court, W. D. Louisiana, Lake Charles Division.

June 11, 1941.

Modisette & Adams, of Jennings, La., and S. W. Plauche, of Lake Charles, La., for plaintiffs.

McCoy, King & Jones, of Lake Charles, La., for defendants.

DAWKINS, District Judge.

The nature of the bill of complaint in this case is set forth fully in the opinion on the plea to the jurisdiction handed down herein on August 23, 1938. 24 F.Supp. 835. Briefly, it is a demand for an accounting for sums alleged to have been paid, the proceeds of certain sales and leases, and for a conveyance of the remaining lands under the terms of an alleged option by James M. Henderson, deceased, to William Conklin. In passing upon the plea to the jurisdiction, it was, in effect, held that the demand was for an interest in or claim to real property, within the meaning of Section 57 of the Judicial Code, 28 U.S.C.A. § 118, covering actions of a local nature. As to the contention in support of the plea to the jurisdiction that the petition did not show the alleged option to purchase real property had been accepted in writing, it was pointed out that this was a matter to be considered more properly on an exception of no cause of action. Thereafter, on August 26th, 1938, such an exception was filed by defendants. It was submitted on briefs and on October 3rd, 1938, an amended bill of complaint was filed. The allowance of this amendment was opposed, and the matter was finally disposed of by a written memorandum filed December 23 of

the same year, D.C., 28 F.Supp. 701, permitting the amendment, and at the same time directing the plaintiffs to furnish defendants with copies of the alleged acceptance of the option by plaintiffs. Subsequently, counsel for plaintiffs supplied to defendants copies of letters written by William R. Conklin, the party named in the alleged option, his attorneys and attorneys for the defendants, beginning with April 6th, 1935, as well as copy of an assignment by Conklin to Southern Lands, Inc., the other plaintiff in this case. The motion to dismiss for failure to state a cause of action was finally overruled by an order entered January 11th, 1939.

In connection with the redrafted bill of complaint, plaintiffs had propounded certain interrogatories to the defendant. September 11th, 1939, defendants filed answer to the petition, as well as to the interrogatories. At the same time, it was brought to the attention of the court that the defendant widow of J. M. Henderson, and mother of the other defendants, had died, and her heirs thereafter were made parties. Defendants admitted the execution by their father on April 2nd, 1917, of the option bearing that date, attached to the original petition, but denied the genuineness of one bearing date November 7th, 1933. In other words, they contended that the alleged option of the latter date was a forgery. In the alternative, defendants urged certain other defenses, not necessary to detail at this time.

The case was tried for some three days, the larger portion of the evidence on both sides being directed to the issue of the genuineness of the signature on the alleged option of November 7th, 1933. Of course, if it should be found that the name of J. M. Henderson appearing upon this document is not genuine, this will dispose of the case. Denial of the signature places the burden upon the plaintiffs to prove its genuineness. La.Code of Practice, Art. 325, et seq. Succession of Gaines, 38 La.Ann. 123, 133; Succession of Randazzo v. Ferrentelli, 130 La. 552, 58 So. 335; Succession of Wadsworth, 152 La. 131, 135, 92 So. 760; Watts v. Collier, 140 La. 99, 72 So. 822.

The document in question is as follows:

"Option to Purchase Real Estate

"I, James M. Henderson, of Des Moines, Polk County, Iowa, in consideration of one ($1.00) dollar in hand paid by W. R. Conklin, of Jefferson Davis·Parish, Louisiana, I hereby give to the said Conklin an option to buy the said Henderson's interest, in the following described Real Estate for the sum of Eight Thousand One Hundred Thirty-three Dollars and Four Cents ($8,133.04) with seven (7%) per cent interest from the time the money is so paid, and it being distinctly understood that the said Henderson quit claims all his right, title and interest in the therein described property in case the said option is exercised by the said Conklin as the said Henderson may have in said property by reason of the purchase at the Bankruptcy Sale figured to April 2nd, 1917 and other payments later on the following described Real Estate, to-wit:

"The North West quarter and the West half of North East quarter of Section twenty-three (23), Township Eleven (11), South Range Four (4) West, being Two hundred and forty (240) acres more or less, and the North West quarter of Section twenty-six (26), and the East One Half (½) of the North East quarter of Section Twenty-seven (27), T S–11 South of Range Five (5) West Louisiana Meridian being Two Hundred Forty (240) Acres more or less and an undivided Half interest in the West Half of the North West quarter of Section Nineteen (19), T S–11 South Range Four (4) West Meridian, and the South West quarter and the East half of the North West quarter, and West half of the North East quarter of Section Twenty-four (24), T S–11 South Range Five (5) West and the undivided one half interest (½) in Lots Four (4) and Five (5) Block Twenty-three (23) and all of the East half of Block Eight and all in the McFarlands original Plat of the Town of Jennings, Louisiana, this last half (½) of the Four hundred (400) Acres you sold me together with Sixty-six and two thirds (66⅔) Acres being the one ninth (1/9) interest your wife owned in the Harvey Estate I will sell you that for the same as I paid you for it, $40 (Forty Dollars) per Acre, your wife's interest was not in the Bankruptcy Sale.

"In 1930 February 8th you only owed a balance of Two Thousand Four Hundred Sixty-four Dollars and Seven Cents (2,464.07) on account of you losing your Iowa land at Tax Sale after you saved me the Two Thousand and Forty-five ($2,045) Dollars that Archie House owed me I would have lost only for your help, that Tax Sale you have Three (3) years to re-

deem, money is hard to get, and I am going to give you plenty of time, I extend it to November 1937, I don't want you to fail to pull out.

"Dated Des Moines, Iowa, the 7th day of November, 1933.

"(Signed)    J. M. Henderson"

The alleged assignment by Conklin to Southern Lands, Inc., is also quoted:

" 'State of Louisiana ⎱
Parish of Jefferson Davis ⎰

"Before Me, Anna H. Simmons, a Notary Public in and for said above named Parish and State, duly commissioned and qualified, on this day in the presence of the two subscribing lawful witnesses, personally came and appeared

William Randolph Conklin.

also called W. R. Conklin, widower of Mildreth Harvey, deceased, a resident of Jennings, Louisiana, who declared and acknowledged that for and in consideration of One Hundred ($100.00) Dollars and other good and valuable considerations paid to and received by him, he has sold, assigned, transferred, conveyed, set over and delivered and by this act and these presents does now sell, assign, transfer, convey, set over and deliver unto

Southern Lands Inc.

a Louisiana corporation, organized under the laws of the State of Louisiana, domiciled at Jennings, herein represented by its duly authorized President, Zada Modisette, all the following described property situated in the Parish of Jefferson Davis, State of Louisiana, and in the County of Polk, State of Iowa, to-wit:

" 'Option to Purchase Real Estate

" 'I, James M. Henderson, of Des Moines, Polk County, Iowa, in consideration of one ($1.00) Dollar in hand paid by W. R. Conklin, of Jefferson Davis Parish, Louisiana, I hereby give to the said Conklin an option to buy the said Henderson's interest, in the following described Real Estate for the sum of Eight Thousand one Hundred Thirty-three dollars and Four Cents ($8,133.04) with seven (7%) per cent interest from the time the money is so paid, and it being distinctly understood that the said Henderson quit claims all his right, title and interest in the herein described property in case the said option is exercised by the said Conklin as the said Henderson may have in said property by reason of the purchase at the Bankruptcy Sale figured to April 2nd, 1917 and other

payments later on the following described Real Estate, to-wit:

" 'The North West quarter and the West half of the North East Quarter of Section Twenty-three (23), Township Eleven (11) South Range Four (4) West, being Two hundred and forty (240) acres more or less, and the North West quarter of Section twenty-six (26) and the East One Half (½) of the North East quarter of Section Twenty-seven (27), T S–11 South of Range Five (5) West Louisiana Meridian being Two Hundred Forty (240) acres more or less and an undivided Half interest in the West Half of the North West quarter of Section Nineteen (19), T S–11 South Range Four (4) West Meridian, and the South West quarter and the East half of the North West Quarter, and West half of the North East quarter of Section Twenty-four (24), T S–11 South Range Five (5) West and the undivided one half interest (½) in Lots Four (4) and Five (5) Block Twenty-three (23) and all of the East Half of Block Eight and all in the McFarlands original plat of the town of Jennings, Louisiana, this last half (½) of the Four hundred (400) acres you sold me together with sixty-six and two thirds (66⅔) Acres being the one ninth (⅑) interest your wife owned in the Harvey Estate I will sell you that for the same as I paid you for it, $40 (Forty Dollars) per Acre, your Wife's interest was not in the Bankruptcy Sale. In 1930 February 6th you only owed a balance of Two Thousand four Hundred Sixty-four Dollars and Seven Cents (2,464.07) on account of you losing your Iowa land at Tax Sale after you saved me the Two Thousand and Forty-five ($2,045) Dollars that Archie House owed me I would have lost only for your help, that Tax Sale you have Three (3) years to redeem, money is hard to get, and I am going to give you plenty of time, I extend it to November 1937, I don't want you to fail to pull out.

" 'Dated Des Moines, Iowa, the 7th day of November 1933.

" '(Signed)    J. M. Henderson'

"To Have and to Hold all of the said property and the rights and choses in action in full property, with full subrogation to all rights and actions against the said J. M. Henderson, his heirs, successors, administrators, executors and assigns, and any and all other rights owned, claimed or held by appearer herein as grantor and assignor and with full warranty of title against the

acts of appearer unto the said Southern Lands, Inc., a corporation, its successors and assigns, forever."

"Thus Done, Signed and Passed before me, Notary, at my office in Jennings, Louisiana, on this 1st day of December, A. D., 1933, in the presence of Frieda Zobel and Katharine Ostrand, lawful witnesses.

"Southern Lands, Inc.

"By (Signed)  Zada Modisette, President

"Witnesses:

"(Signed)  Katharine Ostrand
"(Signed)  Frieda Zobel

"(Signed)  William R. Conklin
Grantor

"(Signed)  Anna H. Simmons,  (Seal)
"Notary Public."

There is nothing to show that the alleged option was ever recorded, although it was copied in full in the assignment. The only thing which the court has been able to find in the large mass of documentary evidence in regard to the recordation of the assignment is the allegation of the bill of complaint that the copy attached thereto was "recorded" in conveyance book No. 64, page 407, of the records of Jefferson Davis Parish. This, of course, does not show the date of recordation. Notwithstanding the defendants have contended from the inception that the alleged option was a forgery and that Conklin conceived the idea of forging it after explorations for oil in the vicinity of these lands had developed in the latter part of 1934 and early 1935, neither the two witnesses nor the notary, whose names appear upon the alleged assignment were called to say whether that document was actually executed on the date it purports to bear, to-wit, December 1st, 1933. If it had been recorded promptly after its execution, this would have taken place during the lifetime of J. M. Henderson, since he died on March 18, 1934, some three and one-half months later. Either a showing of such recordation within that time or the testimony of the attesting witnesses and notary would have had material bearing upon the defendants' assertion that both the alleged option and its assignment were after-thoughts. It further appears that a counter letter was given by Southern Lands, Inc., to Conklin to show a retained interest in the property, but he received nothing else as a consideration for the assignment, except the services of his attorney, and some shares of stock in the corporation in event the lands were finally recovered. If the assignment was actually executed on December 1st, 1933, with Henderson still alive, it would further seem that the corporation or its officers would have undertaken to have its terms made more specific as to what was due by Conklin, so that it would know just what it was acquiring, as well as the amount, if any, necessary to be paid, in order to have a conveyance to it of the lands. On the other hand, the evidence shows that Conklin said nothing in his correspondence with Mrs. Henderson and her children about having such an option until his letter of April 6th, 1935, more than a year after the death of Henderson, and notwithstanding in the meantime, Conklin had been writing numerous letters to Mrs. Henderson endeavoring to obtain authority to "lease your lands". Significantly, this first mention of the alleged option is made in a typewritten letter, whereas a dozen or more other letters to Mrs. Henderson, referring to "your lands" had been written by hand. During this correspondence, Conklin ascertained that she had leased some of the lands, which he was seeking authority to handle. He does claim that, in some rather indefinite manner, he informed Mrs. Henderson in the fall of 1934, more than six months after the death of Henderson that the latter had given him another option to re-purchase the property. This is positively denied by Miss Beulah Henderson, who on the trial, testified that Conklin stated affirmatively that he had nothing to show any interest in the property. Mrs. Henderson was dead when the case was tried, and of course, could not testify on the subject of whether Conklin mentioned the matter as he claims, but both she and her children have denounced the document as a forgery from the beginning.

It is true that Conklin did not display a very high degree of intelligence as a witness. In fact, his counsel calls him "dumb". In this connection, it may be well to consider the involved and ambiguous wording of the alleged option of November 7th, 1933. The original one admittedly executed in 1917, on the other hand, is reasonably clear and explicit as will be seen from its provisions quoted as follows:

"Option to Purchase Real Estate.

"I, James M. Henderson, of Des Moines, Polk County, Iowa, in consideration of One Dollar ($1.00) in hand paid by W. R. Conklin of Jefferson Davis Parish, La. hereby give to the said Conklin an option

to buy the said Henderson's interest in the following described real estate, to-wit:

"The Northwest Quarter and the West Half of the Northeast Quarter of Section 23, Township 11, S. R. 4 West, being 240 acres more or less, and the Northwest quarter of Section 26 and the East Half of the Northeast Quarter of Section 27, Township 11, Range 5 West, being 240 acres more or less, and an undivided one-half interest in the West half of the Northwest Quarter of Section 19, Township 11, S. R. 4, and the Southwest Quarter and the East Half of the Northwest Quarter and West Half of the Northeast Quarter of Section 24, Township 11, R. 5 West, and an undivided one-half interest in Lot 1 being a certain tract of land lying West of Bayou Nezpiqur, containing 400 Arpents and being the upper one-fourth of Spanish Grant A No. 170 Section 39, Township 8, S. R. 3 West, and an undivided one-half interest in Lots 4 and 5 in Block 23, McFarland's Original Plat of the town of Jennings, and the undivided one-half interest in 200 Arpents of land being the upper half of Lot 3 of the Joseph De Chuets Tract Spanish Grant A No. 170 section 39, Township 8, S. R. 3 West and all of the East Half of Block 8 in McFarland's Original plat of the town of Jennings, La.

"For the sum of Eight Thousand One Hundred Thirty-three Dollars and for Four Cents ($8,133.04) with seven per cent interest from April 2, 1917 together with all taxes and expenses that the said Henderson may pay or be obligated for with seven per cent interest from time to time the money is so paid. This option is subject to lease to G. D. Longman of a part of said premises for five years.

"This option to expire April 2, 1918, and it being distinctly understood that the said Henderson quit claims only such right, title and interest in the above described property in case said option is exercised by said Conklin as the said Henderson may have in said property by reason of the purchase at the bankruptcy sale, and that he makes no covenants whatever as to said title. If this option is not exercised on or before April 2nd, 1918, it shall be void and of no effect.

"Dated at Des Moines, Iowa this 2nd day of April, 1917.

"(Signed) James M. Henderson.

"The time of this option is extended to April 3, 1920.

"(Signed) James M. Henderson."

Attention is directed to the wording of the third paragraph of this last quoted instrument fixing the price to be paid for the property if the option was exercised, and the interest rate, and then follows the clause "together with all taxes, and expenses that the said Henderson may pay or be obligated to pay for with seven per cent interest from time to time the money is so paid." This quoted expression, it would appear, meant that each additional sum so paid out by Henderson, should bear interest from the date of payment at the rate stated. However, when we turn to the document, whose genuineness is questioned, we find that after using substantially the same wording in the beginning, the same figures of $8,133.04, as used in the proposal of April 2, 1917, are transposed from a position following the description of the property to the first paragraph and the figures are immediately followed by the expression "with seven per cent interest from the time the money is so paid." In the one of 1917, it was clearly provided that this sum of $8,133.04 should bear seven per cent interest from April 2nd, 1917. The phrase "from the time the money is so paid" could therefore, it would seem, have no meaning in the relation in which it was used in the questioned document for the reason that the sum was known and fixed at the figure of $8,133.04, as of the date of the original option. The questioned document in this respect, bears some evidence of an attempt to use the wording of the original option, but in doing so, the writer got some of it at least, out of place. Other expressions, in the original option are also identical in the questioned document, to-wit: "It being distinctly understood that the said Henderson quit claims all his right, title and interest in the herein described property in case the said option is exercised by said Conklin as the said Henderson may have in said property by reason of the purchase at the bankruptcy sale figured to April 2, 1917 and other payments later on the following described real estate." Attention may also be called to the fact that while the property is not described exactly in the same manner in both instances, when checked there is not a great deal of difference. At the same time an attempt appears to have been made to identify parcels of it with transactions according to the present contention of Conklin. Again, it says: "In 1930 February 8, you only owed a balance of two thousand four hundred sixty-four dollars and seven

cents on account of your losing your Iowa land at tax sale". Although unable, apparently, to answer many simple questions intelligently, without any memorandum before him, Conklin was able, in reply to a question by the Court, to give the exact figures contained in this purported option of the balance which he claimed to owe Henderson. After stating in reply to questions by counsel that Henderson had furnished him a statement of the balance due, without being able to say when or what had become of it, finally the court asked him "Who did you give it to?" "It was $8,000 and some hundreds of dollars. I had paid him something like ten thousand dollars, which left me owing him four hundred sixty-four dollars and seven cents." These figures were evidently well impressed on his mind.

On January 2nd, 1932, Henderson gave Conklin an option to purchase certain lands in Iowa and here again, the wording is characteristic and reasonably clear as compared with the questioned document. This option of 1932 reads as follows:

"I James M. Henderson of Des Moines, Polk County, Iowa, in consideration of one dollar ($1.00) in hand paid by W. R. Conklin of Jefferson Davis Parish, La. give to the said Conklin an option to buy the said Henderson's interest in the following described real estate situated in the county of Polk and State of Iowa to wit:

"Lots Nine (9), Ten (10) and Fourteen (14) of the Partition Plat of the Lysander Harvey Estate in Section Eight (8).

"Township Seventy-eight (78) Range Twenty-three (23), West of the 5th P. M. now included in and forming a part of the City of Des Moines, Iowa, containing about forty-four (44) acres.

"For the sum of nineteen hundred and four 83/100 dollars $1904.83 with six per cent interest from January second 1932 together with all taxes and expenses that the said Henderson may pay or be obligated for with six per cent interest from the time the money is so paid.

"This option expires January 2, 1934 and it being distinctly understood that the said Henderson quit claim only such right title and interest in the above described property, in case said option is exercised by said Conklin as the said Henderson may have in said property by reason of the purchase and taxes and that he makes no covenants whatever as to said title, if

this option is not exercised on or before January 2, 1934 it shall be void and of no effect.

"Signed this Second day of Jan., 1932.
   "(Signed)   J. M. Henderson"

It will be observed that this document, both in its mechanical construction, arrangement of paragraphs and wording, other than description of the property and amount to be paid is almost identical with the option of April 2nd, 1917, although in the handwriting of Henderson. It is also positive as to date at which it expired, as was true of the one of 1917, including the extension to April 2, 1920; whereas in the questioned document, the expression is at the end and after referring to property which Conklin had lost at tax sale, concludes with the same indefinite expression: "I extend it to November, 1937, I do not want you to fail to pull out." This method was used notwithstanding an attempt was made to adopt a form similar to the other two options, which Henderson admittedly had given and signed, that is, the one of April 2nd, 1917 and of January 2nd, 1932.

It was also shown that on the very day that the purported option or questioned document bears, November 7th, 1933, Henderson wrote from Des Moines, Iowa, to Conklin a letter, in which no mention of this option is made. In this letter Henderson suggests to Conklin, apparently having in mind lands in Iowa: "If I was you, I would let them take the land for taxes. I would get a loan on the land and redeem the land * * *". Is it reasonable to suppose that if Conklin's financial condition was such that Henderson was suggesting that the former allow his lands to sell for taxes that he would be at the same time entering into an agreement for Conklin to purchase this comparatively large tract of land in Louisiana? Although Conklin in a rather indefinite sort of way in his testimony and more positively in his pleadings, claimed that Henderson had renewed the option upon these lands from time to time after the expiration of the extension to April 2, 1920, on the bottom of the first one of April 2nd, 1917, none of any such documents were ever produced or any letters passing between them which in any manner tended to confirm this contention. According to Conklin, the questioned document was drawn up, signed by Henderson and brought with him to Louisiana and deliv-

ered to Conklin at the place where the former was having constructed a residence on some of these lands. However, the evidence is unrefuted, except by the statement of Conklin, that Henderson did not come to Louisiana until some days after the first of December, 1933, and that the lumber for the building in question was not purchased before the middle of December. The carpenters who did the work swore they started on December 18th, yet Conklin claims the building was well advanced in its construction when Henderson delivered him the option at the site. The fact that the assignment purports to have been made on December 1st, of course, made it necessary to show that the same had been delivered before that date, but as previously stated if the unconflicting statements by apparently disinterested witnesses both in Louisiana and Iowa are to be believed, including the railroad agent who sold Henderson his ticket to Louisiana, and the carpenters who were doing the work on the house, Henderson never reached Louisiana until about a month after the date of the alleged option and several days subsequent to the assignment.

All of these facts and circumstances have been cited to show conditions before, at the time, and subsequent to the alleged execution and delivery of the option and making of the assignment. The next logical step is to consider the evidence on the subject of the genuineness of the signature to plaintiff's exhibit A, the questioned document.

Both sides selected some of the outstanding experts in the field of handwriting or questioned documents. Plaintiff's experts were Mr. Herbert J. Walter, and Mrs. Katharine Keeler of Chicago, whose qualifications and experience are fully detailed in their testimony. They were not informed, when giving their original opinions as to whether counsel submitting the matter represented the side claiming genuineness or forgery. The conclusions announced by them and later in their depositions were to the effect that the signature on this document was written by the same hand as those on some fifty other specimens of admittedly genuine writing of Henderson. They pointed out numerous details as to what they considered conclusive evidence of genuineness. Plaintiff also offered the testimony of bank officers, etc., who handled the checks and signature cards of Henderson, who swore that in their opinions, the signature was genuine and that checks signed in that manner would have been paid.

On the other side, defendants selected Albert S. Osburn, Eldridge, W. Stein, of New York, and A. T. Scovill, of Sterling, Illinois, all of whom were equally positive that the signature was not written by Henderson, but was forged, by someone who took a genuine specimen of a date many years prior to 1933 and traced or drew it upon the purported option. Each of these witnesses knew that counsel who submitted the matter represented the side claiming forgery.

All of this evidence, together with specimens of admittedly genuine handwriting of Henderson, including enlarged photographs have been carefully examined and studied. The many details and points cited by each as to why the signature was genuine or false were followed with the testimony of witnesses who appeared personally, as has been done with respect to the depositions of those taken out of court. A few things will be mentioned, which in my judgment, tend to establish forgery of this signature. In the first place, when it is placed among those admitted to have been written by Henderson, either in the original or as photographs, normal or enlarged, the differences in the pen strokes seem to me to be at once apparent. In other words, the lines in the questioned signature appear to have been drawn or traced rather than written. This is evidenced not only by the differences in the width of the same stroke but by greater numbers of serrations, apparent changes in pen pressure, stoppage in the movement of the pen, etc. It seems to me the most conclusive evidence of this method of making the signature is seen in the capital M of the initials. It is not so noticeable when looking at the original (Exhibit A) with the naked eye, but when viewed closely under the microscope or in the enlarged photographs, it can be seen that the first upward stroke of this letter was not made with one continuous movement of the pen. At the point where it crosses the second upward stroke, which of course was made after the first, there is a definite change in direction of the pen, indicating to my mind, and according to some of the experts, that the lower end of the first upward stroke was added evidently to conform more exactly to the speci-

men being used. The point made by defendants' witnesses that in the small o toward the end of the name, the upward stroke or curve to the right or last line was concluded with an abrupt stop of the pen and that it was then taken up and placed on the paper just inside the o before starting the final n, I think is borne out by careful examination. Much additional weight is given to the view of forgery, I think, by the fact, emphasized by those giving the opinion that the signature was not that of Henderson, that the specimens over a period of approximately thirty years showed a tendency on his part to change the slant of the capital M from slightly right of vertical, until in the fall of 1933 when the questioned document is supposed to have been signed, when he had acquired a fixed habit of slanting it decidedly to the left; and that he also made it shorter than the two other initials, contrary to his custom of earlier years. This tends to confirm the idea that the genuine specimen selected for copying antedated by several years that of the alleged option.

There should be judgment for the defendants.